[No. 29609. Department Two. September 27, 1945.]

WILLIAM BEDGISOFF et al., Appellants, v. HANNAH MORGAN et al., Respondents.[1]

[1]Reported in 162 P. (2d) 238.

*Eggerman, Rosling & Williams,* for appellants.

*Brethorst, Holman, Fowler & Dewar, Oliver Ingersoll, Medley & Haugland,* and *Army Seijas,* for respondents.

MALLERY, J.—The plaintiffs, operators of a moving picture theater in Seattle, own another theater in that city which they caused to be leased to Hannah Morgan and Henry Moorman on the 24th day of July, 1943, for a term of four years and six months beginning as of August 1, 1943, and ending on January 31, 1948, at a monthly rental of four hundred twenty dollars per month. Among other things, the lease contained a provision to the effect that it should not be assigned or any part sublet without the written consent of the lessor.

On September 1, 1943, Hannah Morgan and Henry Moorman assigned the lease to G. A. Graf and Lloyd V. Lamb and by a conditional sales contract sold them their theater fixtures and equipment for the sum of twenty thousand dollars, seven thousand dollars being paid before September 3d and the balance of thirteen thousand dollars to be paid at the rate of two hundred fifty dollars per month plus interest at four and one-half per cent. The plaintiffs refused to give their consent to the assignment of the lease.

This was the situation when the following telephone conversation between Henry Moorman and Mr. Hone, chairman of the board of directors of the Independent Theater Owners Association, occurred as related by Mr. Hone.

"I said, 'You know, Henry, that Bill'—meaning Bill Bedgisoff—'will not transfer the lease to Graf and Lamb nor to anyone else.' "To which he said, 'Well, we have a way to get around that.' "

This was not denied. Thereafter and on the 21st day of September, 1943, Hannah Morgan and Henry Moorman entered into the following contracts with Graf and Lamb:

### "MANAGEMENT CONTRACT

"THIS AGREEMENT made this 21st day of September, 1943, between HANNAH MORGAN and HENRY MOORMAN of the City of Seattle, Washington, hereinafter called 'first parties', and G. A. GRAF and LLOYD V. LAMB, hereinafter called 'second parties',

"WITNESSETH:

"WHEREAS, first parties are the owners of the personal property and the business known as the First Avenue Theater, located at 1413 First Avenue, Seattle, Washington; and

"WHEREAS, Henry Moorman is of draft age and the said business is not defined as an essential industry, and Hannah Morgan is not in good health; and

"WHEREAS, the second parties represent that they are experienced theater managers and as a combination have a definite plan for the promotion of business and for the benefit of the operation of said First Avenue Theater and are desirous of an opportunity to manage the same, now, therefore

"The first parties agree to employ the second parties, and the second parties agree to accept such employment, as managers of the said First Avenue Theater, under the following terms and conditions, to-wit:

"(1). This management contract shall refer solely to the business known as the First Avenue Theater located at 1413 First Avenue, Seattle, Washington, and shall continue during the term of September 1, 1943, to the 31st day of January, 1948.

"(2). It is expressly agreed that the first parties are the owners of the tangible personal property located in the said

theater and of the leasehold in the real estate in which the same is situate. Second parties shall commit no act nor suffer anything to be done inconsistent with said ownership.

"(3). *Second parties guarantee that through their management they will produce a net revenue for the first parties of Two Hundred Fifty ($250.00) Dollars per month. So long as this revenue is derived said second parties shall have and are hereby given broad powers of management,* with full authority to engage in contracts, take out licenses, sign film contracts and other proper business agreements in their own name or in the name of the First Avenue Theater. Said second parties expressly agree, however, that they will not pledge, hypothecate or encumber the property of the first parties with any mortgage or lien indebtedness, nor sell or replace any part thereof, without the written consent of the owners first had and obtained.

"(4). *The second parties shall be responsible for and assume, and agree to pay, all charges and expenses of every kind and nature incidental to the operation and management of said theater,* including all help, labor, rent, film contracts, taxes and assessments, state, municipal and federal, including occupation taxes, payroll deductions, contributions, etc., including adequate fire insurance and public liability premiums and every other charge whatsoever, *and shall save and protect the first parties harmless from any such claim, charge, assessment or debt or default of every kind and nature during the continuance of this contract.*

"(5). The first parties shall deduct from the income, and second parties agree to pay, the sum of Two Hundred Fifty ($250.00) Dollars on the first day of each and every month hereafter during the full period of this contract. *Said payments and all expenses and costs of operation shall be paid before the second parties shall receive any remuneration.*

"(6). *The second parties shall receive as compensation* for their services, and in full of all remuneration due them, *all of such sums which they are able to produce from the management of said business in excess of the costs of operation, expenses and the return herein required for first parties.*

"(7). Second parties agree to devote their best energies to the promotion of the said business, it being understood, however, that they will not give their exclusive time to the said management.

"In Witness Whereof the parties hereto have hereunto set their hands and seals the day and year first above written.

> "Hannah Morgan
> "Henry Moorman
> > First Parties
> "G. A. Graf
> "Lloyd V. Lamb
> > Second Parties"

(Italics ours.)

### "Supplemental Agreement

"This Agreement made this 23rd day of September, 1943, between Hannah Morgan and Henry Moorman, of Seattle, Washington, hereinafter called 'first parties', and G. A. Graf and Lloyd V. Lamb, hereinafter called 'second parties',

"Witnesseth:

"Whereas, the parties hereto have heretofore entered into a certain management contract dated September 21, 1943, covering the premises known as the First Avenue Theater, located at 1413—First Avenue, Seattle, Washington; and

"Whereas, the second parties are considering the probability of making certain improvements, additions and possible investments in the said premises; and

"Whereas, the parties are mutually desirous of clarifying certain provisions of the aforesaid agreement;

"Now, Therefore, in consideration of the sum of One ($1.00) Dollar by each party to the other in hand paid, and other good and valuable consideration, the receipt whereof is hereby acknowledged,

"It Is Hereby Agreed:

"(1). That at all times during the continuance of the said management contract, the first parties shall have the right to dictate all matters of policy in connection with the conduct of the said theater and shall pass upon all matters of capital expenditure.

"(2). Second parties shall be premitted to make certain improvements to the entrance of the theater and to redecorate the entrance and foyer. The costs of these improvements shall be paid out of income and charged as an operating expense. Second parties may become entitled to reimbursement for these and other additional expenditures and improvements as hereinafter provided.

"(3). Each party shall have the right to terminate the

said management contract upon the following conditions and provisos;

"First parties shall have the right to terminate the said management contract upon thirty (30) days notice in writing first given second parties, provided, however, that it is recognized in such contingency, that the sum of One Hundred ($100.00) Dollars per week is a fair and reasonable minimum salary to be guaranteed each of the said managers for services during the time that they shall have actually acted in said capacity, and first parties agree that if the earnings actually received or made from the business are insufficient to meet said schedule, then and in that event, to pay second parties that sum of money required to pay them for their said time at the said rate; and shall further reimburse said second parties in full for and on account of any payments or part payments of equipment, additions, improvements, or personal property, which said second parties may have made in connection with the said premises.

"(b). Second parties shall have the right at any time to terminate their services and the said management contract upon thirty (30) days notice of such intention in writing first given to said first parties, provided, however, that in the event that second parties elect to terminate the said contract they do agree that the maximum earnings that each of said parties shall be entitled to during the term of their services shall be no more than the sum of Seventy-five ($75.00) Dollars per week, and second parties agree to refund to first parties all earnings, advancements or withdrawals which amount to more than the said agreed maximum rate, and provided further that in the event of such termination of services by second parties, the first parties shall be obligated to refund to second parties only the actual cash value on termination date of any additions, improvements or investments which the said second parties may have made in the said premises or business property.

"In Witness Whereof the parties hereto have hereunto set their hands and seals the day and year first above written.

| "Hannah Morgan | G. A. Graf |
| "Henry Moorman | Lloyd V. Lamb |
| "First Parties | Second Parties" |

Plaintiffs brought this action praying for a judgment adjudicating a forfeiture of the lease, quieting the title to the premises, and awarding them the possession thereof.

The issue in this case is whether or not the management contracts heretofore set out constitute in effect an assign÷ ment of the lease to which plaintiffs had refused their consent.

The seven thousand dollars paid to Morgan and Moorman by Graf and Lamb under the original arrangement, according to the defendants' theory, was returned to Graf and Lamb, who thereupon immediately repaid it to Morgan and Moorman as consideration for the execution of the management contracts. The purported management contract ran until the expiration of Morgan and Moorman's lease. By its terms, Graf and Lamb guaranteed to pay as net revenue to Morgan and Moorman the sum of two hundred fifty dollars per month, and their broad powers of management were to continue as long as they fulfilled this obligation. Under no circumstances were Morgan and Moorman entitled to any larger sum of money, and all responsibility for the costs of the operation of the theater was assumed by Graf and Lamb.

In the supplemental agreement, Morgan and Moorman were given the right to dictate all matters of policy in the operation of the theater, but the broad powers of management given to Graf and Lamb in the management contract are not affected. There is an apparent overlapping of authority of the parties in the two instruments. With this we are not concerned, since the action is not between the parties to the instrument.

So far as plaintiffs herein are affected, the statements in the supplemental agreement pertinent to Morgan and Moorman's authority should be closely scrutinized as self-serving declarations. The important fact is that Graf and Lamb guarantee to pay Morgan and Moorman two hundred fifty dollars per month in any event, and no more under any circumstances, and that sum comprises the sole benefit that Morgan and Moorman can derive from the operation of the business in which they have no reversionary rights except, of course, in case of a default.

The trial court held the instruments to be a management

contract and gave judgment for the defendants. The plaintiffs appeal.

■ It is a well-settled rule of law that whether or not an instrument is deemed an assignment of a lease is to be determined by its legal effect and not by the form of the instrument.

" 'An assignment of a term for years occurs when the lessee transfers his entire interest therein without retaining any reversionary interest. If an instrument so transfers the lessee's interest, it constitutes an assignment regardless of its character and form.' " *American Sav. Bank & Trust Co. v. Mafridge,* 60 Wash. 180, 110 Pac. 1015.

"The form of the transaction is not material, its character in law being determined by its legal effect." 32 Am. Jur. 289.

"It is well-settled law that any instrument which has the effect of transferring the entire interest of the lessee to a third person is an assignment. The form of such transaction is immaterial. Its character is determined by its legal effect." *Poe v. Silver,* 134 Kan. 803, 8 P. (2d) 945.

"No importance is attached to the words 'demise' or 'lease' or to the form, covenants or conditions of the contract if its legal effect be to convey the entire term." *Sheridan v. Doherty,* 106 Wash. 561, 181 Pac. 16.

"That an assignment of a lease causes a forfeiture does not prevent the usual inference arising from occupation. There is no reason why a presumption of an assignment would not arise, even in a proceeding to enforce the forfeiture. The fact that an assignment will forfeit the lease is a strong motive for concealing the fact of assignment and the character of the possession of the assignee. Thus the existence of such a condition of forfeiture in the lease is, if anything, an additional reason why a third person in possession should be presumed to be an assignee of the lessee and compelled to explain the character of his possession." Jones on Landlord and Tenant, § 442, p. 503.

In *Frasier v. Witt,* 62 Cal. App. 309, 217 Pac. 114, defendant, lessee, being unable to obtain consent to an assignment entered into a "contract for services" with Weadon, under which Weadon managed the apartment house, paid the lessee a fixed amount each month and retained the balance

of earnings from the apartment house. In holding for the plaintiff in an unlawful detainer suit, the court said:

"The instrument executed by appellant and the Weadons, though it is styled a 'Contract for Services,' is but a thinly veiled attempt to conceal appellant's deliberate evasion of her covenant not to sublet the premises or transfer the use or possession thereof. Looking beyond the form of the transaction to discover its true import we can readily see that the arrangement made with the Weadons amounted to an underletting of the premises, notwithstanding the parties designated their agreement a contract for services. Under the provisions of the instrument the Weadons were not to go into occupation simply as servants of appellant. They were new tenants, and not merely new occupants. A part of the lessee's estate was transferred to them. That is, they were given the right of exclusive possession for a definite term, one year, for which a fixed rent was reserved. . . . It is clear that it was within the contemplation of the parties that *the Weadons should have the right to receive and retain the whole income to be derived from the apartments. . . . Such a provision is wholly inconsistent with the idea that the Weadons were but servants of appellant.* . . . Clearly, the transaction possessed all the elements necessary to constitute it an underletting of the leased premises, let the parties to it call it what they may." (Italics ours.)

In the *Frasier* case, as well as here, the "managers" were to receive all the profits. This is inconsistent with the contention that the original lessees still have an interest in the business. This is not the case where an owner hires another to manage his business and pays this other a percentage of the profits, and still has an interest in the business and his income fluctuates with the profits. In the instant case all Morgan and Moorman had a right to receive was two hundred fifty dollars per month. Whether the business operated at a profit or a loss was immaterial to this right.

In *Weintraub v. Weingart,* 98 Cal. App. 690, 277 Pac. 752, the lessee was refused consent to an assignment and attempted to get around the refusal of the intended assignee who was to pay all of the obligations of the business and to receive all of the profits. This was held to be an obvious

attempt to evade the provisions of the lease, and the court said:

"Whether or not an instrument is to be deemed an assignment of a lease is to be determined by the legal effect and not the form of the instrument. The law always respects form less than substance. . . . If its legal effect is to substitute a third party for the lessee, conferring upon him the right to the benefits and subjecting him to the burden of the lease for the balance of the term thereof, without providing for any reversionary interest in the original lessee, it will be held to amount to an assignment."

See, also, *Dieter v. Scott*, 110 Vt. 376, 9 A. (2d) 95; *Aveline v. Ridenbaugh*, 2 Idaho 168, 9 Pac. 601; *Indianapolis M. & C. Union v. Cleveland, etc. R. Co.*, 45 Ind. 281; *Singer v. Krohnberg*, 294 S. W. (Mo. App.) 728.

We hold that the instruments in this case constitute an assignment of the lease and are not a contract of employment.

The respondents contend that, since appellants, in their brief, did not assign as error the findings of fact made by the trial court and made no reference thereto, the statement of facts filed herein should be stricken, and the findings of fact of the trial court should be accepted by this court as the established fact in the case.

The appellants' assignments of error are as follows: (1) The trial court erred in dismissing plaintiffs' complaint and in not declaring that the management contract constituted an assignment of the lease; (2) the trial court erred in not quieting title to the premises in plaintiffs free and clear from any and all claims of defendants and awarding possession of the premises to plaintiffs; (3) the trial court erred in not awarding plaintiffs damages for the reasonable value of the use of the premises since October 14, 1943; (4) the trial court erred in not awarding to plaintiffs a reasonable attorney's fee in the sum of five hundred dollars and for their costs and disbursements.

There is little controversy over the material facts in this case. When conclusions of law are included with the court's findings of fact, they are nevertheless still conclusions of law.

The appellants in this case are confronted with no finding of fact made by the trial court as distinguished from a conclusion of law that they need to overturn. The instruments speak for themselves. Appellants' first assignment of error is sufficient to bring the conclusions of law up for review. The statement of facts will not be stricken.

■ The respondents move to dismiss appellants' appeal for the reason that the settled statement of facts was not on file in this court at the time the case was submitted on the oral arguments. This is not a jurisdictional step under our rules.

"After a statement is filed in the superior court there seems to be no limitation as to time when it may be certified." *Prospectors' Development Co. v. Brook*, 31 Wash. 187, 71 Pac. 774. See, also, *Floding v. Denholm*, 40 Wash. 463, 82 Pac. 738.

This court has passed on the merits of cases where the statement of facts was filed in this court after the submission of the case and has never dismissed an appeal on the ground that it was filed after submission. The motion is denied.

The judgment is reversed, with directions to forfeit the lease and award appellants the right to possession of the premises together with a reasonable attorney fee and costs.

BEALS, C. J., BLAKE, ROBINSON, and SIMPSON, JJ., concur.