[No. 29609.    *En Banc.*    March 20, 1946.]

WILLIAM BEDGISOFF *et al., Appellants,* v. HANNAH MORGAN *et al., Respondents.*[1]

*Eggerman, Rosling & Williams,* for appellants.

*Brethorst, Holman, Fowler & Dewar, Oliver Ingersoll, Medley & Haugland,* and *Army Seijas,* for respondents.

PER CURIAM.—Upon a rehearing *En Banc,* a majority of the court adheres to the Departmental opinion heretofore filed herein and reported in 23 Wn. (2d) 737, 162 P. (2d) 238; and in addition the trial court is further directed to fix and allow damages in favor of the appellant at the rate of four hundred twenty dollars per month for the period involved. An attorney fee of five hundred dollars is hereby fixed and allowed, and the trial court is directed to enter judgment accordingly.

DRIVER, C. J. (concurring)—I concur in the result of the *per curiam* and the Departmental opinion.

This court has held in many cases that findings of fact not mentioned in the assignments of error will be taken as the conclusively established facts on appeal, but all such holdings which have been brought to my attention by citations in the briefs or otherwise have been in legal, as distinguished from equitable, actions. Thus, *Hubbell v. Ernst,* 198 Wash. 176, 87 P. (2d) 985, 124 A. L. R. 667, was an action against the state director of the department of social security to obtain old age assistance payments; *LeCocq Motors, Inc. v. Whatcom County,* 4 Wn. (2d) 601, 104 P. (2d) 475, was an action for labor, materials, supplies, and rental of equipment furnished to a county at its request; *Hansen v. Lindell,* 14 Wn. (2d) 643, 129 P. (2d) 234, was an action on a promissory note; and *Brydges v. Millionair Club,* 15 Wn. (2d) 714, 132 P. (2d) 188, and *Hafer v. Marsh,* 16 Wn. (2d) 175, 132 P. (2d) 1024, were actions for unlawful detainer.

It seems to me that, in equity cases, the requirement with reference to predicating specific assignments of error on the findings of fact should not be enforced with the same strictness as in actions at law. No findings of fact are required in an equity action. When findings are made, they are considered and given great weight, but are not binding on the supreme court. The case comes up on appeal for trial *de novo,* and it is the duty of this court to make an independent examination of all the evidence in order to determine what findings should have been made. *Columbia Lbr. Co. v. Bush,* 13 Wn. (2d) 657, 126 P. (2d) 584, and the cases therein cited; *Widman v. Maurer,* 19 Wn. (2d) 28, 141 P. (2d) 135; *Wingard v. Pierce County,* 23 Wn. (2d) 296, 160 P. (2d) 1009.

[1]Reported in 167 P. (2d) 422.

The foregoing firmly established rules would be robbed of much of their meaning if, in an equity case, the findings not specifically assigned as erroneous must be taken as verities; for, manifestly, there would not be an independent examination of all the evidence by this court, but only—and precisely as in an action at law—an examination to the extent necessary to determine whether the evidence is sufficient to sustain the particular findings, if any, against which assignments of error have been directed.

In *Wingard v. Pierce County, supra,* an equity case, the trial court made findings of fact, but an examination of the briefs discloses that the findings were not even mentioned in the assignments of error, which were, in effect, that the trial court erred in entering judgment quieting title in respondent to certain lands and in refusing to quiet title in appellant. That this court did not accept the findings as verities, although no assignment of error had been predicated upon them, is clearly indicated by the following excerpt from the opinion:

"We realize that this is an equity case, and that in such cases findings of fact are not required; also, that on appeal such cases are tried *de novo* and that in its consideration of the particular case this court is required to make an independent examination of all the evidence and all of the circumstances disclosed by the statement of facts, and from such examination decide what findings should have been made."

In that case, the findings of fact were considered and described as "valuable" because the evidence appeared to be in conflict and rather equally balanced, and the statement of facts was "in large part unintelligible"; but it is also plainly apparent from the opinion that the court considered the entire record.

In the present case, which appellants and respondents agree is an equity case, there is virtually no conflict in the evidence as to the basic facts. Appellants' objection to the trial court's findings (aside from the conclusions of law which they contain) is not that they are contrary to the evidence, but rather that they do not include many pertinent facts and circumstances which tend to support appellants' theory. Appellants contend, and I think their contention is sound, that these omitted facts and circumstances should be considered by this court in its determination of the issues presented.

The principal question to be decided, clearly pointed out by appellants both in their "Statement of Question Involved" and in their "Assignments of Error," and discussed in their opening brief, is whether the trial court erred "in not declaring that the management contract constituted an assignment of the lease." The circumstances bearing upon that question briefly summarized are as follows:

On September 1, 1943, respondents Morgan and Moorman, the tenants of the theater involved, sold it under a conditional sales contract to respondents Graf and Lamb for the principal sum of twenty thousand dollars, payable seven thousand dollars down and the balance in monthly installments of two hundred fifty dollars and extending to January 31, 1948, the expiration date of the lease. Graf and Lamb made the initial payment of seven thousand dollars, and took over and proceeded to operate the theater.

The lease contained a covenant against assignment without the consent of the lessor, and the lessor, appellant Bedgisoff, refused to consent to an assignment to Graf and Lamb. When an officer of the Independent Theater Owners said to respondent Moorman in the course of a telephone conversation, "You know, Henry, that Bill [Bedgisoff] will not transfer the lease to Graf and Lamb nor to anyone else," Moorman replied, "Well, we have a way to get around that." Shortly thereafter, on September 21, 1943, Morgan and Moorman and Graf and Lamb ostensibly canceled the conditional sales contract and executed the management contract and supplemental contract set out in the Departmental opinion.

By the terms of the contract, Graf and Lamb were employed "as managers" of the theater, and agreed to pay Morgan and Moorman, regardless of whether the operation of the business resulted in profit or loss, two hundred fifty dollars a month from September 1, 1943, to January 31, 1948. Graf and Lamb were to receive all the profits and bear all the losses, and, in any event, Morgan and Moorman were to receive two hundred fifty dollars a month for fifty-two months—precisely the same as the installment payments which would have been required to pay the balance of the purchase price under the conditional sales contract. The management contract executed on September 21, 1943, was made retroactive to September 1, 1943, so that Graf and Lamb were entitled to retain any profits realized from the theater during the three weeks that they had operated it under the conditional sales contract.

It is a significant circumstance that Morgan and Moorman did not return to Graf and Lamb the down payment of seven thousand dollars which the latter had made. There is no mention of that payment in either the management contract or the supplemental contract. When all the parties met September 21, 1943, Mrs. Morgan made a check, in the amount of seven thousand dollars, payable to Graf and Lamb and handed it to the attorney who represented her and Moorman. The attorney then gave the check to respondent Graf's attorney. After a notation to the effect that it was canceled by mutual consent had been endorsed upon the conditional sales contract, and the management contract had been signed, respondent Graf's attorney handed the seven thousand dollar check back to the attorney for Morgan and Moorman and the attorney then gave it to his clients.

As stated, the result of all this was that Morgan and Moorman retained the seven thousand dollars which they had received as a down payment on the purchase price of the theater. In an effort to explain why they had retained it, respondent Lamb testified as follows:

"Q. It had no connection with the Management Contract in any way, did it? A. The $7,000? Q. Yes. A. Well, yes. We did figure that the $7,000 was part of the good will, and so forth, that we would go through with our part of the Manager's Contract. Q. I don't quite follow you, Mr. Lamb. Do you mean that you were supposed to put up $7,000 to secure your performance of the contract? A. To a certain degree. There are certain things in a theater you could wreck pretty quick, you know. Q. Was there any written agreement with reference to the $7,000? A. Not that I know of."

Respondent Moorman testified with reference to the check transaction:

"Q. Then after the Management Contract was signed up, what was done with the $7,000, or this check? A. Well, they [Graf and Lamb] felt that the seven thousand dollars, they would put that up for the privilege of having the Manager's Agreement. Q. In other words, it was consideration for the lease [management] arrangement? A. That's right."

Respondent Graf's attorney testified that the seven thousand dollars had been given to Morgan and Moorman as "consideration or part of the consideration" for the management contract and as "security for its performance."

None of the explanations offered are satisfactory or convincing, to say the least. It is inconceivable that, in a transaction where both parties were represented by counsel, one party would pay over to the other the sum of seven thousand dollars, either as consideration or as security for performance, without making any mention of the matter in the written contract or in any separate writing. It is equally inconceivable that Graf and Lamb would pay seven thousand dollars as consideration for a contract of employment which, by its express terms, provided that it could be canceled at any time on thirty days' notice by the employer, and that, upon such cancellation, Graf and Lamb would be entitled to receive only one hundred dollars a week for their services previously rendered.

It seems clear to me that it was the intention and purpose of the parties to the management contract to carry out, in a different form and under a different name, substantially the same transaction as the attempted transfer under the conditional sales contract; and that the management contract was, in fact, a subterfuge designed to circumvent the covenant against assignment of the lease. Ordinarily, Morgan and Moorman could have employed managers to operate their theater on whatever terms they saw fit, it is true. But, in a situation such as we have here, this court will look beyond mere surface appearances and consider the motive and purpose of the parties, as disclosed by the attendant circumstances, to determine the actual character of the transaction.

The recent case of *State ex rel. Livingston v. Ayer*, 23 Wn. (2d) 578, 161 P. (2d) 429, involved the question of the constitutionality of a statute, enacted at the 1945 session of the legislature, creating in each county of the state a statistics commission, composed of various county officers, to gather and record certain data concerning members and veterans of the armed forces of the United States.

The members of the commission were to receive compensation in addition to their official salaries as county officers, and it was contended that this feature of the statute violated the constitutional prohibitions against increasing the salary of a county officer or public officer during his term of office. It does not appear to be questioned that the legislature had the power to create statistics commissions and to provide compensation for their members, or that county officers were eligible to serve on such commissions. This court, however, looked beyond the superficial appearances of regularity and considered all of the surrounding circumstances to determine the real motive and purpose of the legislature.

At the 1945 session, the legislature had raised the salaries of county officers, to become effective when their current terms of office expire. The statistics commission statute, which, in effect, gave such officers substantially the same monthly salary increase, contained an emergency clause to make it effective immediately, and, according to its terms, it was to expire January 1, 1947. The effect of the statistics commission act, therefore, was to give county officers indirectly an increase in pay which would begin at once and continue until the direct increase in their salaries became operative. Furthermore, the statistics commission act did not say what was to be done with the records to be prepared by the commission or to whom the information was to be available. After considering all the circumstances, this court held the act unconstitutional as to its salary provisions as "nothing more nor less than an attempt to evade the constitutional provisions hereinbefore set out, in that the act did in fact purport to increase the salaries of county officers during the terms of office for which they were elected." The reasoning on which the holding rests is indicated by the following quotation from the opinion:

"In approaching this question, we are mindful of the rule as to the presumption of constitutionality of legislative acts, and we are also mindful that it is not within the province of a court to question the wisdom of a legislative act. But we also have in mind the fact that when it becomes the duty of this court to pass upon the constitutionality of an act of the legislature, we must determine whether or not such act does *in fact* violate some provision of the constitution, and, in doing this, if the court performs its full duty, it will not shut its eyes to obvious facts which would compel a conclusion that the act is unconstitutional, and rest a decision that the act is constitutional upon the mere presumption of constitutionality, or upon the rule that we cannot question the wisdom of the legislature in passing the act, or *upon some declared policy or purpose contained in the act, which policy or purpose cannot be substantiated.*" (Last italics mine.)

In the instant case, the writer of the Departmental opinion, likewise, has taken a realistic view of the situation, and, looking to the purpose and effect of the management contract, rightly has concluded that the covenant against assignment has been breached.

ROBINSON, JEFFERS, BLAKE, and BEALS, JJ., concur with DRIVER, C. J.

STEINERT, J. (dissenting)—The Departmental opinion, to which this court on rehearing *En Banc* now adheres, will be found in 23 Wn. (2d) 737, 162 P. (2d) 238. I dissent from that opinion, on three separate grounds:

I. The appellants having failed to assign any error on the findings of fact made by the trial court, the statement of facts should be stricken, upon the challenge timely interposed by the respondents, and the findings of the court should be accepted as the established facts in the case, supporting and governing the decree dismissing appellant's complaint.

The Departmental opinion summarily disposes of this question in one brief paragraph reading as follows:

"There is little controversy over the material facts in this case. When conclusions of law are included with the court's findings of fact, they are nevertheless still conclusions of law. The appellants in this case are confronted with no finding of fact made by the trial court as dis-

tinguished from a conclusion of law that they need to overturn. The instruments speak for themselves. Appellants' first assignment of error is sufficient to bring the conclusions of law up for review. The statement of facts will not be stricken."

Appellants' first assignment of error, to which the Departmental opinion has reference, is expressed in this form:

"The trial court erred in dismissing plaintiffs' [appellants'] complaint and in not declaring that the management contract constituted an assignment of the lease."

If there is "little controversy over the material facts," then those *facts*, as found by the trial court, constitute the case upon which the decision must rest; and, since there is no assignment of error addressed to those facts as found, they are necessarily controlling, leaving for consideration only the one question whether or not the decree is supported by the findings. Incidentally, the decree simply recites that the court, having heard the testimony, and having taken the cause under advisement, and having read the briefs and law pertaining thereto, and having made findings of fact and conclusions of law, orders, adjudges, and decrees that appellants' complaint be dismissed.

The Departmental opinion says, however, that "the appellants in this case are confronted with no finding of fact made by the trial court as distinguished from a conclusion of law that they need to overturn." It is not quite clear from this statement whether it is meant that the "findings," as a whole, constitute merely conclusions of law, or whether there is no single finding or series of findings contrary to appellants' contentions regarding the facts.

The best, and only, way to determine that matter is to have the findings of fact which were made by the trial court squarely before us. They are as follows:

"FINDINGS OF FACT.

I

"That William Bedgisoff and Florence Bedgisoff are husband and wife and the owners of the South one-half (S½) of Lot Seven (7), Block F, A. A. Denny's Fourth (4th) Addition to the City of Seattle, King County, State of Washington.

II

"That the defendant Hannah Morgan is a widow, and that the defendants Henry Moorman and Jenny Moorman are husband and wife.

III

"That on or about the 24th day of July, 1943, Samuel Friedman, as trustee for the plaintiffs, leased to the defendants Hannah Morgan and Henry Moorman, for a term of four and one half (4½) years, beginning as of August 1, 1943, for the rental of $420.00, payable monthly in advance, the following described property: [certain portions of a building located on the above described lot] That on the 26th day of August, 1943, Samuel Friedman executed and delivered to the plaintiffs a deed to the said property, subject to the lease.

IV

"That the defendants Hannah Morgan and Henry Moorman went into possession of the said premises and have continued in said possession at all times subsequent to said date, to wit, August 1, 1943.

V

"That the defendants Hannah Morgan and Henry Moorman paid to the plaintiffs the rents provided for in the lease due on August 1, 1943, and September 1, 1943, and that they did thereafter tender on the first day of each and every month the sum of $420.00, as provided for in the said lease. That the plaintiffs refused to accept the said

monthly payments and the defendants Hannah Morgan and Henry Moorman thereafter and prior to the trial hereof deposited all the rents due and owing under the said lease up to December 1, 1944, into the registry of the court, subject to the order of the court.

## VI

"That on the 1st day of September, 1943, the defendants Hannah Morgan and Henry Moorman conditionally entered into an agreement to sell to the defendants G. A. Graf and Lloyd Lamb the furniture, furnishings and fixtures in the said premises, together with an assignment of the lease. The sale, however, was expressly conditioned upon the defendants Hannah Morgan and Henry Moorman securing the consent of the plaintiffs to the assignment of said lease. That the plaintiffs refused to consent to said assignment and that on September 21, 1943, the defendants, in writing, cancelled the said conditional sales contract.

## VII

"That at said time the defendant Hannah Morgan was in ill health and unable to operate the theater without assistance, and the defendant Henry Moorman, being of draft age, was required to enter an essential industry, as the management of said theater was not considered by his draft board an essential industry. That the defendants Hannah Morgan and Henry Moorman were unable to manage and operate the theater individually and were required to secure assistance. That on the 21st day of September, 1943, the defendants Hannah Morgan and Henry Moorman entered into an agreement with the defendants G. A. Graf and Lloyd Lamb whereby the latter two were employed as managers of the said theater. That the said agreement expressly provided that the defendants Hannah Morgan and Henry Moorman were the owners of the tangible personal property located in the said theater and of the leasehold of the real estate in which the same was used, and that the defendants G. A. Graf and Lloyd Lamb should commit no act or suffer anything to be done inconsistent with said ownership. That the said agreement further provided that the defendants G. A. Graf and Lloyd Lamb should be entitled as compensation to all of the net returns from the operation of the said theater after there was deducted from the gross receipts all of the costs of operation and the sum of $250.00 monthly for the defendants Hannah Morgan and Henry Moorman. That the said agreement provided for the management of the defendants G. A. Graf and Lloyd Lamb until January 31, 1948.

## VIII

"That on the 21st day of September, 1943, when the said management agreement was executed, it was then agreed by all the parties that a supplemental agreement should be drawn, which supplemental agreement was prepared and executed by the defendants Hannah Morgan and Henry Moorman on September 23, 1943, and by the defendants G. A. Graf and Lloyd Lamb within a few days thereafter. That under the terms of said supplemental agreement it was specifically provided that the defendants Hannah Morgan and Henry Moorman should have the right during the continuance of the management contract to dictate all matters of policy in connection with the conduct of the said theater and should pass upon all matters of capital expenditure. The said supplemental agreement further provided that the defendants Hannah Morgan and Henry Moorman could terminate the employment of the defendants G. A. Graf and Lloyd Lamb upon giving to them thirty days' notice in writing, and that the defendants G. A. Graf and Lloyd Lamb could terminate their employment by giving a like notice to the defendants Hannah Morgan and Henry Moorman. The supplemental agreement further provided that upon the termination of the employment of the defendants G. A. Graf and Lloyd Lamb by the defendants Hannah Morgan and Henry Moorman that the defendants G. A. Graf and Lloyd Lamb would be entitled to a minimum compensation of $100.00 each per week from September 1, 1943, until termination thereof.

It was further provided in said agreement that if in the event the theater had not produced sufficient returns to pay said compensation that the defendants Hannah Morgan and Henry Moorman would pay the said employees the deficiency upon the termination of the said employment agreement. And it further provided that in the event the employment agreement was terminated by the defendants G. A. Graf and Lloyd Lamb that G. A. Graf and Lloyd Lamb would be paid by the defendants Hannah Morgan and Henry Moorman no more than the sum of $75.00 each per week during their employment.

IX

"That during all times from September 1, 1943, the defendant Hannah Morgan was in the said theater an average of several times each week, during which times she examined the receipts, expense accounts and the operation of the theater, and discussed the policy thereof with the employees G. A. Graf and Lloyd Lamb. That the defendant Henry Moorman from September 1, 1943, to April 1944, when he moved from the City of Seattle, was present in the theater many times each week, and during said times did considerable repair work for which he was not compensated, and also discussed with the employees G. A. Graf and Lloyd Lamb receipts, expenditures and the policy of the theater. During said period he also discussed with the said employees the leasing of any films and the substitution of films for those already leased. And since April 1944 the defendant Henry Moorman was present in the theater on many occasions for the same purposes.

X

"That the defendants Hannah Morgan and Henry Moorman operated a moving picture theater on the said premises from the first part of January 1939, and from said date until the present time all of the accounts and records have been held by George Mee, a public accountant, and during all of said period of time the said accountant kept the books and made all returns to the federal, state and city governments.

XI

"That there was on file with the County Clerk a certificate of assumed name showing that the defendants Hannah Morgan and Henry Moorman were doing business under the assumed name of "First Avenue Theater". That the admission returns made to the Federal government were made in the name of First Avenue Theater and were executed under oath by Hannah Morgan, one of the two partners.

XII

"That the defendants Hannah Morgan and Henry Moorman, doing business under the name and style of First Avenue Theater, were issued a business and occupation license by the State of Washington and the City of Seattle, and that all returns were made under the said assumed name from 1939 to the present date. That the returns on Social Security and Unemployment taxes to the Federal government were made by Hannah Morgan and Henry Moorman, doing business under the name and style of First Avenue Theater, and there were no returns made by any other person regarding the operation of the said theater.

XIII

"That the City of Seattle requires a license to be taken out in the name of the manager of a theater, and such license was issued by the City of Seattle to G. A. Graf and Lloyd V. Lamb.

XIV

"That on or about the 23rd day of September, 1943, the defendants Hannah Morgan and Henry Moorman, doing business as First Avenue Theater, notified all distributors of films in the City of Seattle, some seventeen in number, that they had employed the defendants G. A. Graf and Lloyd Lamb as managers of the First Avenue Theater but that they would continue liable for all of the contracts entered into by the said employees.

### XV

"That there was no agreement on the part of the defendants Hannah Morgan and Henry Moorman to sell the furniture, furnishings and fixtures located in the said theater to the defendants G. A. Graf and Lloyd Lamb.

### XVI

"That the defendants Hannah Morgan and Henry Moorman, the lessees of the said premises, violated no provision of the lease entered into between them and Samuel Friedman, and the said lease is in full force and effect.

### XVII

"That the defendants Hannah Morgan and Henry Moorman did not assign the said lease nor sublet any part of the leased premises to the defendants G. A. Graf and Lloyd Lamb, nor did they assign to the said defendants, G. A. Graf and Lloyd Lamb, any other interest or estate in the said lease."

The substance of these findings may be stated thus: Appellants are at the present time owners of the real estate here involved. On July 24, 1943, one Samuel Friedman, as trustee for the appellants (the evidence shows, however, that appellants' interest in, or ownership of, the property was unknown to the respondents at that time), leased to the respondents Morgan and Moorman, who will hereinafter be referred to as though they were the sole respondents, a portion of the premises for theater purposes. Respondents went into possession of the leased premises on August 1, 1943, and have continued in possession at all times ever since. After the lease had been executed, Friedman conveyed the real property to appellants on August 26, 1943. Respondents have paid or tendered to appellants the monthly rental due upon the lease up to the time of the trial of this action. On September 1, 1943, respondents entered into a conditional sale agreement with G. A. Graf and Lloyd Lamb wherein the former agreed to sell to the latter two the furniture, furnishings, and fixtures in the theater, together with an *assignment* of the lease. The sale was expressly conditioned upon respondents' securing the consent of the appellants to such assignment. Appellants, however, refused to give their consent, and the conditional agreement was thereupon promptly canceled in writing.

At that time, respondent Hannah Morgan, a widow, was in ill health and unable to operate the theater without assistance. Respondent Henry Moorman, who is the son of Hannah Morgan, was at that same time of draft age and was required to enter an essential industry as determined by his draft board. Respondents were therefore unable to manage and operate the theater personally and consequently were required to secure the assistance of others. On September 21, 1943, respondents entered into the management agreement with Graf and Lamb, as set forth in the Departmental opinion. On that same day, it was agreed by the parties to that agreement that a supplemental agreement should be drawn. This was done, and the supplemental agreement, which is also set forth in the Departmental opinion, was executed September 23, 1943. Further reference to the details of those two agreements will be made later herein.

At all times since September 1, 1943, respondent Morgan was in the theater on an average of several times each week, examining the receipts, expense accounts, and operations of the theater, and discussing

the policies thereof with Graf and Lamb. For a great part of that same period, respondent Moorman also was present in the theater many times each week, did considerable repair work therein for which he received no compensation, and discussed with Graf and Lamb the receipts, expenditures, and policies of the business and the acquisition of films therefor.

Respondents have at all times since January, 1939, operated the moving picture theater on the premises here in question, all accounts and records being continuously kept by a public accountant and returns made to the Federal, state, and city governments.

There is on file with the county clerk a certificate of assumed business name showing that respondents were doing business under the name of "First Avenue Theater," and admission returns have been made under oath by respondent Morgan and presented to the Federal government. Respondents were also issued a business and occupation license by the state of Washington and the city of Seattle, and thereafter made all the returns for social security and unemployment taxes. The city of Seattle requires that a license for the operation of a theater be taken out in the name of the *manager,* and such license was therefore issued to Graf and Lamb.

At the time of the execution of the above-mentioned supplemental agreement, respondents notified some seventeen distributors of films that they, respondents, had employed Graf and Lamb as managers of the First Avenue Theater and that respondents would continue liable for all contracts entered into by such employees. There was no agreement on the part of the respondents to sell the furniture, furnishings, and fixtures located in the theater.

With the possible exception of the last two numbered findings, as quoted in full above, the proposed findings formally presented to and signed by the trial court, constitute, in my opinion, findings not only of ultimate facts but of probative facts as well. If they do not possess the quality of "facts," then it seems to me that trial courts and practicing attorneys will have extreme difficulty in satisfying the niceties exacted by this court.

Proceeding upon the firm conviction that the foregoing declarations of the trial court constitute findings of fact, I refer to the rules of this court applicable to the situation. Rule 16 (5), 18 Wn. (2d) 18-a, relating to contents and style of briefs, provides: "Each error relied on shall be clearly pointed out and discussed under appropriate designated headings. . . ."

Rule 21, 18 Wn. (2d) 21-a, relating to errors considered, provides: "No alleged error of the superior court will be considered by this court unless the same be clearly pointed out in the appellant's brief. . . ."

Under these rules, it has become the settled law of this state that, where no assignment of error is predicated upon the findings of fact, they must be accepted as the established facts in the case. *LeCocq Motors v. Whatcom County,* 4 Wn. (2d) 601, 104 P. (2d) 475; *Hansen v. Lindell,* 14 Wn. (2d) 643, 129 P. (2d) 234; *Brydges v. Millionair Club,* 15 Wn. (2d) 714, 132 P. (2d) 188; *Hafer v. Marsh,* 16 Wn. (2d) 175, 132 P. (2d) 1024.

Appellants' assignments of error do not attack, nor make any reference whatever to, the court's findings, but, so far as the present question is involved, simply allege generally that the court erred in dismissing the complaint and in refusing to hold that the management contract constituted an assignment of the lease.

Under these assignments, appellants seek to have this court hold, as a matter of law, that the management contract, considered by itself and regardless of the supplemental agreement, constituted an assignment of the lease. Appellants thus further endeavor to eliminate from consideration all the evidence upon which the trial court made its findings, as contained in 273 pages of the statement of facts and 24 exhibits, retaining only the one exhibit on which they rely. In this connection, it is also significant that, in the argument in their brief in support of their contentions, appellants make no less than forty references to the very statement of facts which they now in effect say, but without any specific assignment of error thereon, affords no support for the court's findings of fact.

The Departmental opinion likewise, on this phase of the case, fails to take into consideration any of the evidence, oral or written, except the management contract and the supplemental agreement, for in that part of the opinion quoted above it says: "The instruments speak for themselves." No consideration is given to the fact that the trial court, after hearing the testimony and observing the witnesses, made findings of fact which indubitably support its decree. The crux of the matter before the trial court was whether or not the respondents, circumstanced as they were at the time, intended to and did actually assign the lease, or whether they merely entered into a contract with Graf and Lamb to operate the theater as managers. That issue was to be determined upon all the evidence, and of course all of the parties realized that such was the situation, for both sides presented voluminous evidence.

To dispose of the matter by simply saying now that the two instruments "speak for themselves" is equivalent to saying that it was unnecessary to have any trial at all other than to establish the execution of the two written instruments. That, in my opinion, is not a proper disposition of the case, and it certainly was not the theory upon which the case was tried to the superior court or presented to this court. I think the statement of facts in this instance should be stricken for failure to take proper assignments of error, and that the findings of the trial court should accordingly be accepted as the established facts. The decree follows the conclusions drawn from the facts as found.

II. Assuming, however, that the statement of facts should not be stricken and that the findings are not to be accepted as the sole established facts in the case, I am of the opinion that a consideration of *all* the evidence, as contained in the statement of facts, justifies and warrants the conclusions and decree entered by the trial court.

It may be conceded that the respondents originally intended and endeavored to dispose of their theater business and to assign the lease to Graf and Lamb. It appears, however, that the conditional agreement covering that transaction required respondents to secure the written consent of the appellants to an assignment of the lease; that appellants

refused to give their consent; and that therefore the agreement was promptly canceled. This left the situation and the relations between the respondents and the appellants exactly as before, that is, appellants were landlords and respondents were tenants of the premises.

As shown above, it had become impossible for respondents to conduct the theater personally, owing to Mrs. Morgan's illness and Mr. Moorman's draft status. They therefore did, on September 21, 1943, what they had a perfect right to do, namely, secure managers for the operation of the theater, entering into a contract with such managers for its operation during the remainder of the term of the lease. The management agreement and the supplemental agreement (which the trial court specifically found were executed in pursuance of the understanding had on September 21, 1943) recited that the respondents were the owners of the personal property and business of the First Avenue Theater; that Graf and Lamb were employed as managers thereof during the term of the lease; that the respondents reserved the right to decide all matters of policy in connection with the conduct of the theater; that the managers guaranteed to produce for the respondents a net revenue of two hundred fifty dollars per month, and should have as compensation for their own services all sums which they were able to produce from the management of the business, over and above all expenses of operation and the amounts of revenue to be derived by respondents; that either party had the right to terminate the agreement upon certain specified conditions, whereupon the managers should receive specified amounts of compensation for the time they "actually acted" in such capacity.

There is nothing on the face of either of these agreements which makes it illegal, and, in the absence of convincing *evidence* to the contrary, a court would not be justified in saying that the respondents had transferred or surrendered to Graf and Lamb all their interest in the property and business. Appellants are not concerned with the amount which respondents agree to pay their managers, or with the basis on which such amounts are to be calculated. Respondents were concerned in their receiving from the operation of their business a guaranteed sum of two hundred fifty dollars a month, and the managers employed by them were willing to give their services for whatever they could produce over and above the guaranteed amount and the costs of operation. Both parties to the agreements were not only satisfied for the time being with that arrangement, but also made provision for termination of the management agreement in the event it should not prove satisfactory to either.

If, perchance, it can be said that a presumption of assignment of the lease arose from the fact that Graf and Lamb were in physical possession of the premises after the contract of management was executed, that presumption was subject to dissipation upon a showing of the actual facts. In the final analysis, the burden was upon the appellants to prove that an assignment was effected; but the trial court, upon due consideration of all the evidence, held that appellants had not met that burden, and so stated in its memorandum opinion.

The Departmental opinion makes the assertion that the statements in the supplemental agreement "should be closely scrutinized as self-serving declarations." The supplemental agreement was, as the trial

court found, a part of the agreement made between respondents and their managers on September 21, 1943. It was therefore no more a self-serving statement than was the contract of management itself, nor any more self-serving than the provisions of any other agreement between parties competent to contract with each other. But, even if the supplemental agreement is to be "closely scrutinized," that is the very thing the trial court did, as appears from its lengthy memorandum opinion which is a part of the record.

The Departmental opinion makes reference to the fact that the seven thousand dollars which was paid by Graf and Lamb under the original arrangement of conditional sale was returned to them and immediately thereafter repaid to respondents as consideration for the execution of the management contract. Appellants contend that this stamps the second transaction as simply a device to accomplish the purpose intended by the conditional sale agreement. The identity of the amount does not make the two transactions identical, either in law *or* in fact. When the first transaction was thwarted by the refusal of the appellants to give their consent thereto, the parties, respondents and Graf and Lamb, had a perfect right to make a contract of management. The theater was a valuable, going concern. Graf and Lamb had experience in that line of business. If they thought that they could make a considerable profit out of its operation, they had the right to enter into the agreement of management; and if they thought that the agreement and its opportunities for profit were worth seven thousand dollars, they had the right to pay that amount for the privilege. That money did not come out of appellants' pocket, nor do they claim to be entitled to it. It was of no concern to them how much respondents were to receive out of the management agreement, or how they paid their managers for services rendered. Appellants' only concern was in the rentals which they were to receive under the lease. Those rentals have all been paid or tendered to them, and they are out nothing on account of the management agreement.

Conceding, even, that the question here may be a close one, the trial court resolved the issue, upon the evidence, and found such a state of facts as would not permit a forfeiture of the lease. It is a well-settled principle of both law and equity that stipulations for forfeiture found in leases are looked upon by the courts with disfavor and are construed strictly, more strongly against the lessor, and liberally in favor of the lessee. *Income Properties Inv. Corp. v. Trefethen,* 155 Wash. 493, 284 Pac. 782.

Upon the record in this case, I think the Departmental opinion should be set aside and the judgment of the trial court affirmed.

III. Finally, even though the findings of the trial court be not accepted as the established facts in the case, and even though it be held that the management contract constitutes, in law, an assignment of the lease, still I think that the lease should not be forfeited, but rather, that the respondents should be required, and permitted, to continue operation of the theater as tenants of the appellants, according to the terms of the lease. Forfeiture in this instance is too harsh and drastic a remedy, under the circumstances shown by this record, and should not be enforced.

When this action was instituted, respondents made an offer to revoke the management contract and to resume active management of the theater, thus satisfying any complaint that appellants might otherwise have had. Appellants, however, declined the offer and insisted upon forfeiture. They themselves own and operate another theater, just two doors north of the one operated by the respondents, and, seemingly, they now desire to acquire for nothing a valuable business owned by their competitors with whom they entered into a lease. In my opinion, it would, in any event, be an equitable disposition of this case, under all the circumstances, to require respondents to stand the expense of this action, but not to take away from them a business which they have successfully operated and maintained since 1929, a period of over fifteen years.

I dissent.

MILLARD and SIMPSON, JJ., concur with STEINERT, J.