[No. 22284. Department One. January 20, 1931.]

CHARLES P. SEGUIN, *as Receiver, Appellant,* v. JOHN PLANO *et al., Respondents.*[1]

[1]Reported in 295 Pac. 179.

*Bert D. Richards* and *Morris & Dubuar,* for appellant.

*Palmer, Askren & Brethorst, P. O. D. Vedova* and *M. H. Van Nuys,* for respondents.

MILLARD, J.—This action was brought by the receiver of the Success Coal Mining Company to recover, from the company's five incorporators, amounts alleged to be unpaid on their subscriptions for the capital stock of the company. The court found that the stock subscriptions of all of the defendants, except John F. Danielson, had been paid in full; that Danielson owed $225.25 on his subscription. Judgment was entered accordingly. The plaintiff has appealed.

The wives of the respondents were made parties defendant, because of the community character of the subscriptions. Reference to the "respondents" in the recital of the facts includes only the husbands.

The respondents are experienced coal miners. For periods of from twenty to thirty years, they were employed in coal mines in various capacities, including that of superintendent. In September, 1924, they prospected land of E. M. Cashman near Ravensdale, Washington, and discovered several veins of bituminous coal. On September 18, 1924, Cashman leased the property to the respondents for a term of fifty years for a total rental consideration of one hundred thousand dollars, of which one thousand dollars was paid when the lease was executed. The respondents agreed to pay one thousand five hundred dollars in 1925, two thousand five hundred dollars in 1926 and two thousand dollars annually thereafter until the one hundred thousand dollars was paid. Respondents never made any payment on the rental, other than the one thousand dollars paid at the time they entered into

the leasing agreement. The lease contained a provision against letting or subletting of any part of the leased property, or assigning the lease, without the written consent of the lessor. On September 26, 1924, the five respondents organized the Success Coal Mining Company, with a capital of fifty thousand dollars divided in fifty thousand shares of the par value of one dollar each. The respondents were named in the articles of incorporation as the first trustees, and signed the articles as incorporators. Each of the respondents subscribed for ten thousand shares of the capital stock. The respondents' lease of the mining property was transferred to the corporation in payment of twenty-five thousand shares of stock; it being agreed that the fair, reasonable, and market value of the lease was in excess of twenty-five thousand dollars. Each of the respondents returned to the treasury of the corporation five thousand shares of the capital stock (a total of twenty-five thousand shares), with the understanding that their stock subscriptions for twenty-five thousand shares (five thousand shares each) be cancelled, and that the twenty-five thousand shares be held in the treasury of the corporation as treasury stock, to be used by the corporation in payment of labor performed by the incorporators, and for labor performed by employees. It was also agreed, by the incorporators, that they should devote their full time to the affairs of the corporation, and that each should be allowed ten dollars a day, which should be paid to them in stock. At this time no debts had been incurred by the corporation. The respondents immediately commenced working in the mine. They worked from September 26, 1924, to March 26, 1925, working seven days a week and more than twelve hours daily. The court found, and the evidence amply

supports the finding, that four of the respondents had fully paid for their shares of stock as follows:

Respondent Barei: $5,000 by assignment of his interest in the lease; $5,400 by labor and services performed; $2,900 by cash paid to the corporation; $250 by sale of a tractor to the corporation.

Respondent Fernango: $5,000 by assignment of his interest in the lease; $5,400 by labor and services performed; $700 by cash paid to the corporation.

Respondent Plano: $5,000 by assignment of his interest in the lease; $5,400 by labor and services performed.

Respondent Wiero: $5,000 by assignment of his interest in the lease; $5,400 by labor and services performed; $55 by cash paid to the corporation.

The court found that respondent Danielson had paid for his ten thousand shares, by assignment of his interest in the lease, and by labor and services performed, all that was due except $225.25.

For their services in operating the mine for eighteen months, the respondents received no payment whatever. True, they received credit on their stock subscriptions. However, they did not draw any money, for any purpose, from the treasury of the corporation. On March 26, 1926, the respondents were without financial resources, and the mine was closed. At that time, the company was indebted in the amount of $2,506.77 to four persons. The creditors to whom this money was due gave credit to the corporation, knowing that the corporation could pay its bills only out of the profits of the mine, and that, if the operation of the mine proved unsuccessful, they could not be paid. No effort was made by the incorporators to place any of the stock on the market, nor was there any attempt to defraud any one. The company sold coal in excess of five thousand dollars, during the eighteen months the

mine was in operation. That money was expended for machinery, supplies and labor.

In 1926, following the forfeiture of the lease, Mr. Cashman, who leased the property to respondents in 1924, and another party endeavored to operate the mine, but failed, because of the flooding of the mine from the old abandoned workings. In 1927, the property was acquired by Turner and Custer, who sold their interests to the Danville Coal Company. That company had expended, up to the time of the trial of this cause, approximately forty thousand dollars in developing the property. Suit was brought in 1927 by one of the Success Coal Mining Company's creditors for the amount due him. Appellant was appointed receiver of the corporation. Hearing was had upon the petition of the receiver for an assessment on respondents' unpaid stock. The claims of the four unpaid creditors were approved, an assessment of the unpaid stock subscriptions ordered, and the appellant was authorized to bring an action to recover same, if not paid. Action was instituted by the appellant and resulted as hereinbefore stated.

Appellant contends that the lease was not of the value of twenty-five thousand dollars in September, 1924, when transferred by respondents to the mining company for twenty-five thousand shares of the company's capital stock.

The price paid by the respondents for the lease does not determine its fair cash market value at the time it was transferred to the mining company.

"The true criterion of the value of property exchanged for stock is its actual cash value, and this is determined very largely by the honest judgment of the directors; but while this valuation is entitled to considerable weight, it is not conclusive. The question on the inquiry is what was the fair estimated cash market value of the property at the date of the incorporation

and not afterwards. It is the value at the time of the exchange and not what it cost the vendor. A provision in a statute allowing a corporation to accept in payment of subscriptions property 'at its fair value' means its actual market or intrinsic value and not its fair value for the purposes of the corporation.'' Vol. 5, Thompson on Corporations (3d ed.), p. 863, § 3996.

To determine the value of the lease, it was important to know the size of the coal field in which the mine in question was located, and the width and depth of the veins of coal, as well as the quality of the same, in the mine covered by the lease. That would directly affect the value of the lease. The actual value of a mining lease is not shown by evidence of what a subsequent lease of the same tract brought at a sale four or five years later. *Pitman v. Ball,* 140 Mo. App. 389, 124 S. W. 1082.

''Evidence on an issue as to the value of real estate, in order to be competent, must relate to the time as of which the value of the property is to be determined, or to a time so near thereto that it may reasonably throw light upon the value at such time, and evidence of value at a time considerably before or after the time to which the controversy relates is incompetent, unless it also appears that the value has remained the same.'' 22 C. J., p. 182, § 131.

The property covered by the lease had an area of one hundred and sixty-four acres, and contained a large bituminous coal bed, in which there were nine known veins of coal ranging from three to nine feet in width and about a mile in length, and had a depth of from one thousand to two thousand feet. It was estimated that in five of these veins there were in excess of four million tons of coal, with a lower percentage of ash and a larger number of heat units than the coal produced from the majority of the mines in King County. The company was not confronted with

transportation difficulties, a railroad being located close to the mine. The respondents were thoroughly familiar with coal formations, coal lands, their value, and also the value of coal mine leases, and were well qualified to testify. They testified that the lease had a value of twenty-five to fifty thousand dollars, and that, in their estimate, they took into consideration all of the necessary elements that go to give value to a mine.

The court stated that, in reaching its conclusion that the lease was of a value in excess of twenty-five thousand dollars, he did not find it necessary to take into consideration the testimony of respondents. A number of witnesses testified that the lease was worth from twenty to forty thousand dollars. One witness, who had been engaged in the coal mining industry for more than forty years (fifteen years of which were in King county, the same county in which the mine in question is located), and who was, at the time of the trial of this cause, superintendent and operator of a coal mine near Issaquah, and at one time was superintendent of the Ravensdale mine, which adjoins the property covered by the lease, testified that he had made many coal-land leases, and had negotiated sales, and was thoroughly familiar with coal-land values and also the values of leases. He was familiar with the Success Coal Mining Company's mine, having worked therein. He prospected the property in 1907, and again inspected the property in 1925, at which time the Success Coal Mining Company had been operating there approximately one year. He estimated that the value of the lease was in excess of twenty-five thousand dollars.

The lease was such property as could be transferred to the company in payment for capital stock. The evidence amply sustains the finding that the lease was

of the value of twenty-five thousand dollars at the time it was assigned to the mining company by the respondents.

 Appellant argues that written consent was not given by the lessor to the assignment of the lease, and seeks to invoke the provision of the contract prohibiting the assignment of the lease without the written consent of the lessor. That question can be raised only by the lessor, who is not here complaining.

"The restriction is for the benefit of the vendor, and he alone can insist on its enforcement, and may waive its benefits. An oral assent to an assignment is a waiver of a provision prohibiting an assignment without the vendor's written assent. The same effect is given to the acceptance of payment from the assignee with knowledge of the assignment." 27 R. C. L., p. 566, § 306.

 We are convinced, by our examination of the record, that all of the respondents, except Danielson, who owes $225.25 on his stock, paid for the balance of the stock (25,000 shares) in cash and by labor performed. They worked long hours, seven days a week for eighteen months, undergoing privation, and doing all that was humanly possible to achieve success. The contention that the wage of ten dollars a day exceeded that paid in other mines in King county and was a larger wage than the non-stockholder employees of the Success Company were paid, does not take into consideration that the respondents were stockholders and were working seven days a week, twelve or more hours daily, while the Success Company's non-stockholder employees and the employees in other mines at six to eight dollars a day were working shorter hours. An analogous situation was presented in *Nichols v. Olympia Veneer Co.*, 139 Wash. 305, 246 Pac. 941. In that case, the non-stockholder employee was paid a

wage less than that received by the stockholder employee. We said:

"Of the ninety or more working in the plant, the far larger number do only routine work of the same character as that performed by the non-stockholders. It does not necessarily follow, however, that the services of these are not of greater value to the corporation than is the service of the non-stockholder. The stockholders have an interest in the success of the business, aside from the wage received, and it would follow, from the nature of the relation, that they would take greater care, and exercise a higher degree of diligence, in performing the work assigned to them than would one whose sole remuneration was the wage he received. The effect of this is not only increased efficiency, but a fewer number will perform the same quantity of work."

The creditors knew that unless the corporation was successful, it could not pay its bills. The creditors knew that the whole undertaking, while promising, was speculative as to its ultimate financial success. It follows that, possessed of such knowledge, and so speculating, the creditors cannot recover against the respondents. *Conner v. Robinson,* 137 Wash. 672, 243 Pac. 849, 246 Pac. 758.

The other questions presented in the briefs have been considered, but a discussion of same is unnecessary.

The respondents, with the exception of Danielson, have fully paid for their stock subscriptions.

The judgment should be, and it is, affirmed.

TOLMAN, C. J., MITCHELL, and PARKER, JJ., concur.