·[No. 31615. Department Two. May 15, 1951.]

SAMUEL G. MORRISON, *as Receiver of Northern Aircraft, Inc., Appellant,* v. WILLIAM R. NELSON *et al., Respondents*[1]

[1]Reported in 231 P. (2d) 335.

*Koch, Morgan & Paul*, for appellant.

*Allen, Hilen, Froude & DeGarmo*, for respondents.

HAMLEY, J.—The receiver of a corporation seeks in this action to recover possession of, and quiet title to, a leasehold, and to obtain an accounting with respect to the use of such leasehold by defendants.

Arthur F. Johnstone is the key figure in the case. In 1946, he was engaged in the business of flight instruction and aircraft sales under the assumed name of Northern Aircraft. On December 23rd of that year, he obtained a thirty-five-year lease from King county, covering a tract of land and improvements at King county airport. The lease provides

that it shall not be assigned unless such assignment is first authorized by resolution of the King county board of county commissioners.

Johnstone incorporated the business on July 31, 1947, under the name of Northern Aircraft, Inc. The corporation was capitalized at two hundred thousand dollars, evidenced by two hundred thousand shares of stock of the par value of one dollar each. Johnstone subscribed for nine thousand shares, and his wife, Mrs. Jo Rene Johnstone, and his attorney, E. J. Eagen, subscribed for five hundred shares each. The first meeting of stockholders was held on August 1, 1947. At this meeting there was read and considered a written offer, submitted by Johnstone, whereby he agreed to transfer certain assets of the corporation in exchange for 147,109 shares of stock in the corporation and the promise of the corporation to assume certain liabilities. This offer recites, in part:

"I have a lease dated December 23, 1946, with King County Washington, recorded in Volume 45, Page 44, of the records of King County. If the consent of the Board of Commissioners of said County can be obtained, I shall cause said lease to be assigned to said corporation, or in the event that said consent is refused, I shall secure permission for said corporation to use said leased premises. Pending such approval, said corporation shall operate all businesses now conducted by me at Boeing Field for its own use and benefit and at its own risk, but subject, however, to all the provisions of said lease.

"All of the foregoing shall be done in consideration of the issuance to me of said number of shares of stock in said corporation. A statement of the assets and liabilities covered by this offer shall be prepared and attached hereto and marked Exhibit 'A'. The corporation shall assume and agree to pay the liabilities listed in Exhibit 'A'.

"If the said corporation accepts this offer I agree, upon request, to execute any and all additional papers or instruments which may be necessary or proper to effect the transfer of said assets to the corporation.

"This offer shall be accepted by having the President and Secretary of the said corporation affix their signatures hereto, after authorization therefor shall have been received from the Board of Directors."

Exhibit A thereafter attached to this offer lists the net value of properties to be transferred at $147,108.95, including the leasehold and improvements located thereon at $108,058.86. The stockholders, at this first meeting, authorized the directors to accept this offer "if they were satisfied with the value of the assets to be transferred" after the statement (exhibit A) had been obtained. Pursuant to this authority, Johnstone and Eagen met as the board of directors, on September 16, 1947, and accepted the offer.

The minutes of this meeting specifically recite that this leasehold, exclusive of improvements, had been appraised at seventy-five thousand dollars, and state that the value of the assets set forth in exhibit A was "substantially correct." A motion was carried authorizing the issuance of 147,109 shares of stock to Johnstone "in payment for said assets." Johnstone, as president of the corporation, and Eagen, as secretary, thereupon, under date of September 16, 1947, attached to the offer a signed statement stating that "we accept the foregoing offer on behalf of Northern Aircraft, Inc. . . ." The 147,109 shares of stock were then issued to Johnstone. The corporate books of account list the leasehold, exclusive of improvements, as an asset in the sum of seventy-five thousand dollars.

Johnstone informally requested the consent of King county to an assignment of the lease to Northern Aircraft, Inc. Such consent was refused. Johnstone did not thereafter execute and deliver to the corporation a written assignment of the leasehold. The corporation, however, took immediate possession of the leasehold, and made full use thereof until dispossessed in the manner described below.

The corporation was not a financial success. After the first of June, 1948, Johnstone began staying away from the business for extended periods of time, leaving affairs largely in the hands of his attorney, Stephen J. Morrissey. Johnstone was having difficulties with respect to another corporation, Northern Airlines, Inc., which had gone into receivership. It was apparently because of this that he was not available from August, 1948, for the remainder of that year.

It is at this point that defendants William R. Nelson and Forrest Taylor entered the picture. Nelson and his father each held a note, executed by Johnstone, in the sum of ten thousand dollars, which notes Johnstone had originally delivered to the younger Nelson in exchange for the latter's stock in Northern Airlines, Inc. Taylor had gone to work for Johnstone at Yakima when the latter first began business under the assumed name of Northern Aircraft. He followed the enterprise to Seattle in 1946, and continued as an employee after Northern Aircraft, Inc., was organized. During most of this period, Taylor was chief pilot for the company. After Johnstone left in the summer of 1948, Taylor was placed in charge of operations at the field as flight manager.

In the latter part of November and the early part of December, Nelson and Taylor began negotiating for the purchase of Johnstone's stock in Northern Aircraft, Inc., and the lease which Johnstone had obtained from King county. This transaction was consummated on December 23, 1948. On that date, acting through his wife as attorney in fact, Johnstone executed an assignment of the leasehold and sold all of his capital stock in Northern Aircraft, Inc., to Nelson and Taylor. Johnstone was paid twenty-five hundred dollars in cash, in addition to which Nelson and his father canceled Johnstone's two ten-thousand dollar notes.

Prior to this transaction, neither Nelson nor Taylor was familiar with the general financial affairs or solvency of the corporation. Nor did they have knowledge of the recitals of the corporate records and accounts concerning Johnstone's offer of the lease to the corporation and its acceptance by the corporation. Taylor, as a company employee, had known for some time, however, that some of the company's bills were not being promptly paid. He and Nelson also knew, prior to December 23, 1948, from sources other than the official books and records of the corporation, that Johnstone had offered to assign the lease to Northern Aircraft, Inc., but that King county had refused to consent to such assignment.

On the day that Nelson and Taylor acquired the assign-
ment of the lease from Johnstone and purchased the latter's
capital stock, a special meeting of the board of directors was
called. At this meeting, Nelson was appointed a director and
was elected the new president; Taylor was appointed a
director and was elected vice-president and treasurer; and
Mrs. Taylor was elected secretary. A resolution was then
adopted authorizing the issuance to Johnstone of a corporate
promissory note in the sum of seventy-five hundred dollars,
secured by a chattel mortgage, in full settlement and release
of certain claims which Johnstone asserted against the cor-
poration. Five days later, Nelson, as president, and Mrs.
Taylor, as secretary, executed, in affidavit form, a report
of allotment of shares of the corporation, declaring that the
leasehold and improvements thereon, valued at $108,058.86,
and other assets, belonged to the corporation.

Nelson and Taylor then obtained from King county, under
date of January 3, 1949, a formal consent to the assignment
of the lease from Johnstone to themselves, individually. In
connection with this transaction, they paid the county
twenty-nine hundred dollars then owing the county on the
1946 lease.

A few weeks after Nelson and Taylor took over the cor-
poration, their attorney discovered that the lease in question,
together with the improvements on the leasehold, were
being carried on the books of the corporation at a valuation
of $108,058.86. A special combined meeting of the stock-
holders and board of directors was held on February 1, 1949,
to consider this matter. It was there decided that, since
Johnstone had been unable to obtain the consent of King
county to the assignment of the lease to the corporation, no
assignment had been given and the corporation had never
had any interest in the lease or the improvements located
on the leasehold. The stockholders and directors then agreed
to accept an offer by Nelson and Taylor to return 108,058
shares of stock and eighty-six cents in cash to the company,
"to thereby enable the records and the books of the company
to accurately reflect the true status of its affairs." A cor-

rected report of allotment was also executed to delete reference to the lease and improvements and the issuance of 108,058 shares of stock delivered to Johnstone in consideration thereof.

Northern Aircraft, Inc., was in fact insolvent from the day of its organization. Nelson and Taylor came to realize this shortly after they took over the company. They nevertheless hoped to keep the corporation going for a while, for the purpose of reducing its indebtedness. Along in February, 1949, however, they reached the conclusion that this would no longer be possible. The corporation was then confronted with a heavy government claim. There had also been brought to light a previously unsuspected debt of eighteen thousand dollars, which had been incurred by Johnstone.

Accordingly, Nelson and Taylor in February, 1949, organized Airflight, Inc., for the purpose of carrying on the same business as Northern Aircraft, Inc. They assigned the lease to Airflight, and obtained the consent of King county to such transfer. The new corporation commenced business at the same location which had been occupied by Northern Aircraft, Inc., the latter corporation being, to all intents and purposes, abandoned. Sometime thereafter Northern Aircraft, Inc., went into receivership. It is that receiver who now seeks to quiet title to, and regain possession of, the leasehold, obtain an accounting of the income of the leasehold during the period of dispossession, and recover judgment for the sum found due under such accounting.

The summary set out above represents our view of the facts after a careful examination of the record, and is in substantial accord with the findings of fact of the trial court. On the basis of these facts, the trial court held that the lease had never been assigned to and become an asset of Northern Aircraft, Inc. Judgment was therefore entered for defendants. Plaintiff has appealed.

Appellant contends that the trial court erred in concluding that the lease had not been assigned to the insolvent corporation of which appellant is the receiver.

It is acknowledged that there was no formal instrument denominated an "assignment." The only pertinent exchange

of writing between Johnstone and the corporation was his offer of August 1, 1947, and the corporation's acceptance, dated September 16, 1947. In the opening paragraph of that offer, Johnstone offered to "transfer and assign" to the corporation "all of my right, title and interest to certain assets owned by me" and used in the business conducted under the name of Northern Aircraft Company. This same paragraph recites, as the consideration for his transfer of properties to the corporation, the transfer to him of 147,109 shares of the corporate common stock (representing, at one dollar a share, the net value of properties he proposed to convey to the corporation).

The remainder of the offer, in which particular reference is made to the lease, has been quoted above. It will be noted that this portion of the offer recites that a statement of the assets and liabilities covered by the offer would be prepared and attached thereto and marked exhibit A. This was done. This exhibit lists, among other things, the leasehold at a value of seventy-five thousand dollars, and the buildings located thereon at $33,058.86, making a total value of $108,058.86.

It is apparent from this offer, when read as a whole, that upon acceptance thereof and payment of the stipulated consideration, the corporation was to receive and enjoy Johnstone's entire right, title and interest in and to the lease, whether or not a formal assignment of the lease could be executed. It is undisputed that the corporation did immediately accept the offer and issue and deliver to Johnstone the stock called for therein. It is likewise undisputed that the corporation assumed immediate possession and occupancy of the premises. It began operating the business. There is nothing to indicate that such use, occupancy and operation were intended to be temporary in character.

Johnstone at no time claimed a reversionary interest in the lease or disturbed the corporation in its possession. In the fall of 1947, he attempted to obtain the consent of King county to the assignment, but failed in this endeavor. However, he did not, on the basis of such failure, seek to repossess

the leasehold or in any way challenge the corporation's position as an assignee. His first adverse action was taken more than a year later when, acting through his attorney in fact, Johnstone sought to assign this same lease to Nelson and Taylor.

 The facts reviewed above must be considered with relation to the general rules governing the assignment of leases. An assignment of a lease occurs when the lessee transfers his whole interest therein without retaining any reversionary interest. *McDuffie v. Noonan,* 176 Wash. 436, 29 P. (2d) 684; 32 Am. Jur. 289, Landlord and Tenant, § 313. If an instrument so transfers the lessee's interest, it constitutes an assignment regardless of its character and form. 51 C.J.S. 553, Landlord and Tenant, § 37. Thus, in holding that a management contract relative to the operation of a moving picture theater was in effect an assignment of the lease, we said, in *Bedgisoff v. Morgan,* 23 Wn. (2d) 737, 744, 162 P. (2d) 238, 163 A. L. R. 513 (modified on another point in 24 Wn. (2d) 971, 167 P. (2d) 422, 163 A. L. R. 520):

"It is a well-settled rule of law that whether or not an instrument is deemed an assignment of a lease is to be determined by its legal effect and not by the form of the instrument. [Citing authorities.]"

The same rule was announced in *Weintraub v. Weingart,* 98 Cal. App. 690, 277 Pac. 752, involving facts very similar to those presented in the case before us. Weintraub had leased a hotel to Weingart, the lease containing a covenant against assigning without the lessor's written consent. Weingart later organized a corporation to carry on the hotel business. Instead of executing a formal assignment of the lease to the corporation, Weingart entered into an agreement with the corporation reciting that since the lease could not be assigned without the lessor's consent, Weingart would hold the lease for the use and benefit of the corporation. The lease was listed as a corporate asset of the value of fifteen thousand dollars, in the corporation's application for permission to sell capital stock. The lessor, upon learning of this transaction, brought an action for unlawful detainer, because of breach of the covenant to assign.

In affirming a judgment for the plaintiff in the *Weintraub* case, the court said:

"In the first place, the language above quoted from the agreement between Weingart and the corporation indicates that it was intended to take the place of an assignment in the usual form, because of the difficulty or impossibility of securing the consent of the lessor to such an assignment. In the second place, it constitutes Weingart a mere naked trustee to hold the lease in trust for the corporation, and for the latter's *use and benefit*, the corporation to 'pay all rentals and obligations' assigned by Weingart in the lease. . . .

"Whether or not an instrument is to be deemed an assignment of a lease is to be determined by the legal effect and not the form of the instrument. The law always respects form less than substance. (Civ. Code, § 3528.) If its legal effect is to substitute a third party for the lessee, conferring upon him the right to the benefits and subjecting him to the burden of the lease for the balance of the term thereof, without providing for any reversionary interest in the original lessee, it will be held to amount to an assignment." (pp. 696-698)

In view of the terms of Johnstone's offer, taken as a whole, and the conduct of the parties in relation thereto, the conclusion is compelled, in the light of the rules referred to above, that there was, in effect, an assignment of the lease from Johnstone to the corporation in the fall of 1947. There can be no other explanation of the corporation's act in paying to Johnstone, in the form of corporate stock, the full appraised value of the lease, and of Johnstone's act in accepting such payment and leaving the corporation in undisturbed possession of the premises and business. He simply agreed to assign, or, if that was not possible, to hold the lease for the use and benefit of the corporation, just as Weingart did in the case cited above. We must, as the court did in that case, look through form to substance, and recognize this transaction for what it really was—an assignment of the lease to the corporation.

It is appreciated that the paragraph of Johnstone's offer, wherein he proposed to obtain the consent of the county, conditioned the promise to assign upon the obtaining of that consent. It is apparent from the conduct of the parties, how-

ever, that this condition was treated only as a means of relieving Johnstone from liability in the event such consent could not be obtained. The assignment itself was considered by the parties as consummated by the acceptance of the offer and the payment of the consideration.

An assignment in violation of a restriction is not void, but voidable at the option of the lessor. Such an assignment is good as between the assignor and assignee, subject to whatever rights the lessor may have. *Dyer Bros. etc. Iron Works v. Pederson,* 112 Wash. 390, 192 Pac. 1002, 197 Pac. 622; *Klee v. United States,* 53 F. (2d) 58; 32 Am. Jur. 296, Landlord and Tenant, § 325; 51 C. J. S. 546, Landlord and Tenant, § 34. Accordingly, the invalidity of an assignment, on the ground that it has not been assented to by the lessor, can be raised only by the lessor. *Seguin v. Plano,* 160 Wash. 421, 295 Pac. 179; *Erckenbrack v. Jenkins,* 33 Wn. (2d) 126, 204 P. (2d) 831; *Bemis v. Wilder,* 100 Mass. 446; 148 A. L. R. 1361, 1362, annotation.

Respondents contend that this was merely a "paper" transaction between Johnstone as an individual and as sole owner of the corporation. We do not see how that affects the situation, especially where, as here, the rights of creditors are involved. Respondents concede that this is not a case for application of the technical doctrine of piercing the corporate veil. They argue, however, that on general equitable principles, the identity of Johnstone and the corporation should be recognized. No authorities have been cited in support of such a theory, and we have found none. The same argument was advanced in the *Weintraub* case, *supra,* and was rejected.

Johnstone went about the organization of this corporation with all the usual formalities, as evidenced by corporate records and books of account prepared in the customary manner. If the creditors of this corporation are not entitled to the benefit of whatever assets Johnstone voluntarily transferred to the corporation, as shown by the corporate books and records, then no creditor would be safe in dealing with a corporation which was organized (except for quali-

fying shares) by one individual. We find no merit in respondents' contention.

■ Respondents urge that the result here is affected by the fact that the corporation was at all times insolvent, and that the stock which Johnstone received was accordingly "valueless." Johnstone got what he bargained for when he transferred his property to the corporation. He received not only the stock, the future value of which was then problematical, but also the promise of the corporation to assume and agree to pay his personal liabilities in connection with the business, as listed in exhibit A attached to the offer. These liabilities amounted to $94,923.74. There was ample consideration to support this assignment.

■■ The lease assignment from Johnstone to Northern Aircraft, Inc., was consummated prior to the time Nelson and Taylor acquired that corporation. Accordingly, that transaction could not be undone by anything Nelson and Taylor thereafter did by way of returning capital stock and amending the corporate records. Stockholders and directors of a corporation will not be permitted to act in such manner as to benefit themselves personally at the expense of the corporation. See Rem. Rev. Stat. (Sup.), § 3803-33 [P.P.C. § 445-7], defining the fiduciary relationship which exists between a corporation and its stockholders and directors. See, also, *Central Bldg. Co. v. Keystone Shares Corp.*, 185 Wash. 645, 56 P. (2d) 697; *Wool Growers Service Corp. v. Simcoe Sheep Co.*, 18 Wn. (2d) 655, 691, 140 P. (2d) 512, 141 P. (2d) 875; *Larson v. A. W. Larson Constr. Co.*, 36 Wn. (2d) 271, 217 P. (2d) 789.

We intend no criticism of Nelson and Taylor in what has just been said. They doubtless sincerely felt that the assignment had not been completed and that the return of the capital stock and the change of corporate records was therefore required. They were simply mistaken. The trial court specifically found that neither Nelson nor Taylor acted in bad faith in any of their transactions with the corporation.

Respondents argue that the corporate minute books and books of account, to the admission of which they strenuously

objected, should not have been received in evidence. It is their position that these books were not properly identified, nor was there testimony as to the execution or veracity of the books. The only exhibits which need be considered under this assignment of error, in view of the limited questions of fact considered above, are exhibits Nos. 1, 12 and 13.

Exhibit No. 1, the minute book, was a large volume in heavy binding, in which were pasted, in conformity with the usual practice, all the official corporate records and minutes beginning with the corporation license issued on July 31, 1947, and ending with an auditor's receipt, dated February 21, 1949. Taylor, who was vice-president and treasurer of the company, specifically identified this minute book, although he later stated that he did not have personal charge of the book and had never read it. Mrs. Taylor, who was the secretary of the corporation, was asked whether she had seen the minute book before. She replied: "I don't know." Mrs. Taylor testified that a signature attached to the minutes of August 1, 1947, "looks like" Johnstone's. She definitely identified the signatures of herself and Nelson on the minutes of the special meeting held on December 23, 1948, contained in that book.

The minute books were apparently kept in the possession of Mr. Thayer, attorney for the corporation after Nelson and Taylor bought out Johnstone. Mr. Paul, attorney for appellant, testified that he went to Mr. Thayer's office to get the minute book, and was handed exhibit No. 1. Paul also identified Johnstone's signature in this book.

We believe that this testimony, considered together with all of the evidence pertaining to the organization and affairs of the corporation, was sufficient to establish the identity of the minute book and the mode of its preparation, and to indicate that the entries in such book were made in the regular course of business at or near the time of the transactions recorded. We reach the same conclusion with respect to the sheets of the corporate journal and ledger which were introduced as exhibits Nos. 12 and 13.

This being the case, these exhibits were properly admitted, and were competent evidence of the transactions and

events in question. See Business Records as Evidence Act, Laws of 1947, chapter 53, § 2; Rem. Supp. 1947, § 1263-2.

We are of the opinion, for the foregoing reasons, that the trial court erred in concluding that the lease had not been assigned to the insolvent corporation of which appellant is the receiver.

The judgment is accordingly reversed. The cause is remanded with instruction to do all acts and things necessary to restore to appellant the possession, use and enjoyment of the leasehold, in so far as any claims by respondents are concerned, including, if deemed necessary by the trial court, the appointment of a commissioner to execute and deliver to appellant an assignment of the lease. The trial court is further instructed to proceed with an accounting of respondents' possession, use and occupancy of the leasehold, as prayed for in the complaint, and to enter such money judgment as may be indicated by such accounting.

SCHWELLENBACH, C. J., ROBINSON, MALLERY, and GRADY, JJ., concur.