M.R. Wachob Company, Inc., et al. *v.* MBM Partnership
(14952)

Peters, C. J., and Borden, Berdon, Katz and Palmer, Js.

Argued January 10—decision released April 11, 1995

*Samuel D. Bush,* for the appellants (plaintiffs).

*Richard E. Castiglioni,* with whom, on the brief, was *Ann M. Cicchiello,* for the appellee (defendant).

BERDON, J. The dispositive issue in this case is whether a third party who assumes a lessee's obligations to a lessor under a commercial lease is an "owner"

under the provisions of General Statutes (Rev. to 1989) § 20-325a (b).[1] The plaintiff,[2] M.R. Wachob Company, Inc., a licensed real estate agency located in Stamford, brought this action to collect a commission in accord-

[1] General Statutes (Rev. to 1989) § 20-325a provides: "ACTIONS TO RECOVER COMMISSIONS ARISING OUT OF REAL ESTATE TRANSACTIONS. (a) No person who is not licensed under the provisions of this chapter, and who was not so licensed at the time he performed the acts or rendered the services for which recovery is sought, shall commence or bring any action in any court of this state, after October 1, 1971, to recover any commission, compensation or other payment in respect of any act done or service rendered by him, the doing or rendering of which is prohibited under the provisions of this chapter except by persons duly licensed under this chapter.

"(b) No person, licensed under the provisions of this chapter, shall commence or bring any action in respect of any acts done or services rendered after October 1, 1971, as set forth in subsection (a), unless such acts or services were rendered pursuant to a contract or authorization from the person for whom such acts were done or services rendered. To satisfy the requirements of this subsection any such contract or authorization shall (1) be in writing; (2) contain the names and addresses of all the parties thereto, (3) show the date on which such contract was entered into or such authorization given, (4) contain the conditions of such contract or authorization and (5) be signed by the owner or an agent authorized to act on behalf of the owner only by a written document executed in the manner provided for conveyances in section 47-5, and by the real estate broker or his authorized agent.

"(c) The provisions of this section shall not apply to any person excepted from the provisions of this chapter by section 20-329 with respect to any acts performed by him which are included in such exception."

A 1994 amendment to this statute eliminated the ambiguity that is the focus of this case. In No. 94-240 of the 1994 Public Acts, the legislature amended § 20-325a (b) so that the signature of the property owner is required only on a listing agreement for the sale of the property. A listing agreement for the lease of such property need not bear the signature of the "owner." Because the events that form the basis of this action occurred prior to the amendment's effective date of July 1, 1994, however, we must apply the statute in effect during that time.

[2] This action was brought by two plaintiffs: M.R. Wachob Company, Inc. (Wachob), and one of its sales agents, George A. O'Brien. O'Brien was the agent who interacted directly with the defendant and signed the listing agreement on behalf of Wachob. On November 8, 1990, Wachob assigned to O'Brien all of its interest in the balance owed by the defendant on the commission, $95,591.25, and the defendant agreed to make its payments directly to O'Brien, rather than to Wachob. See footnote 8. For simplicity, however, we refer to both Wachob and O'Brien as the plaintiff.

ance with a real estate listing agreement entered into by the defendant, MBM Partnership. The defendant alleged in a special defense that the listing agreement failed to comply with the requirements of § 20-325a (b) because it was not signed by the record owner of the property and, therefore, that the plaintiff was not entitled to recover any commission that was owed. The plaintiff and the defendant each filed a motion for summary judgment, and the trial court rendered judgment for the defendant. The plaintiff appealed from the judgment of the trial court to the Appellate Court, and the appeal was transferred to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c). We reverse the judgment of the trial court.

The facts of this case, although somewhat complex, are not disputed. At all times relevant to these proceedings, Minoff Properties was the record owner of a commercial office building located in Norwalk (Norwalk office building). In May, 1984, Minoff Properties entered into a fifteen year lease with Glyco, Inc. (Glyco). Under the terms of the lease, Glyco had the right to occupy the premises, or to assign the lease or sublet all or any part of the premises to a third party. In the case of an assignment or sublease, however, the lease required Glyco to receive the consent of Minoff Properties, which could not unreasonably withhold its consent.

Lonza, Inc. (Lonza), subsequently purchased Glyco, making Glyco its wholly owned subsidiary. Lonza wanted to move Glyco from the Norwalk office building to a new location in New Jersey owned by the defendant. In order to induce Lonza to do so, the defendant executed an agreement on April 29, 1987, in which it agreed to assume the obligations of Lonza's wholly-owned subsidiary, Glyco, under the terms of the lease between Glyco and Minoff Properties. In this agreement, which was entitled a "guaranty," the defendant further promised to "unconditionally guar-

antee to Lonza and the successors and assigns of Lonza the full and punctual performance and observance, by [the defendant], of all of the terms, covenants and conditions in the Glyco Lease . . . ."[3] This agreement was signed by representatives of the defendant.[4] Simultane-

---

[3] The agreement provided in relevant part:

"GUARANTY

WHEREAS, LONZA, INC., with offices at 22–10 Route 208, Fair Lawn, New Jersey (hereinafter referred to as 'Lonza') is desirous of entering into the lease hereinafter mentioned; and

WHEREAS, MBM ASSOCIATES, with offices at 808 High Mountain Road, Franklin Lakes, New Jersey (hereinafter referred to as 'MBM') is about to enter into a lease with Lonza, for fifteen (15) years in the building located at 17–17 Route 208, Fair Lawn, New Jersey (hereinafter referred to as 'Lease'); and

WHEREAS, MBM has agreed to assume the obligations of Lonza's wholly-owned subsidiary, Glyco, Inc., under the terms of a Lease dated May 24, 1989, between Glyco, Inc., as tenant, and Minoff Properties, as landlord (hereinafter referred to as 'Glyco Lease'); and

WHEREAS, pursuant to Paragraph 23 of the Lease, MBM has limited the extent of its liability under the Lease to five (5%) percent of the appraised value of the Land and Building; and

WHEREAS, Lonza has refused to enter into the said Lease unless MBM further guarantees the Glyco Lease in the manner hereinafter set forth.

NOW, THEREFORE, to induce Lonza to enter into said Lease, which Lease is dated this day and is being executed simultaneously herewith, MBM hereby agrees as follows:

1. Notwithstanding any limitation contained in Paragraph 23 of the Lease to the contrary, MBM unconditionally guarantees to Lonza and the successors and assigns of Lonza the full and punctual performance and observance, by MBM, of all of the terms, covenants and conditions in the Glyco Lease contained on MBM's part to be kept, performed or observed with the exception of any acts of Glyco, Inc., made prior to the Commencement Date of the Lease.

2. This Guaranty shall apply to the said Glyco Lease and to any renewal or extension thereof.

3. This instrument may not be changed, modified, discharged or terminated orally or in any manner other than by an agreement in writing signed by MBM and Lonza."

[4] The defendant, MBM Partnership, was identified in this agreement as MBM Associates, a joint venture between a partnership, Fair Lawn-McBride Associates IV, and a limited partnership, Marcus-Burroughs Associates. Seventeen general partners of the former entity signed the document, as did two general partners of the latter entity.

ously with the defendant's execution of this agreement, Lonza entered into a lease with the defendant. Under the terms of this lease, Glyco became a tenant of the defendant's office building in New Jersey.

The defendant subsequently sought to find a sublessee for Glyco's lease in the Norwalk office building. On June 28, 1989, the defendant executed an exclusive listing agreement (listing agreement) with the plaintiff. This listing agreement, which the defendant prepared and printed on its own stationery, gave the plaintiff the exclusive right to sublease the office space formerly occupied by Glyco in the Norwalk office building. The defendant stated therein that it "has accepted the obligations of the lease between Minoff Properties, Landlord, and Glyco, Inc., tenant, dated, May 25, 1984." Malvern C. Burroughs, a partner of the defendant, signed this agreement on behalf of the defendant. The agreement also was signed by the plaintiff.[5]

On October 20, 1989, the plaintiff notified the defendant by letter that it had located a subtenant for the Norwalk office building. In this letter, the plaintiff sought to "confirm our understanding" that it would receive as a commission 7.5 percent of the total rent for the

---

[5] The listing agreement read as follows:

"M.R. WACHOB COMPANY, INC.
High Ridge Park
Stamford, CT 06905

Attn: George A. O'Brien                Re: Exclusive Agreement
                                       Glyco, Inc. Space
                                       488 Main Ave.
                                       Norwalk, CT

Dear Mr. O'Brien:

MBM Partnership hereby gives to [M.R.] Wachob Company, Inc. (Hereinafter M.R. Wachob), the exclusive right to sublease the office space on the third floor at 488 Main Ave., Norwalk, Ct. (Glyco, Inc. space), containing 17,400 Square Feet.

The Glyco, Inc. lease expires December 31, 1999. The rental rate M.R. Wachob is authorized to offer is $19.50 per square foot for the first five

duration of the lease. Of that amount, the defendant would pay the plaintiff one half upon the subtenant's execution of the lease; one quarter in December, 1991; and one quarter in June, 1992. Because the original listing agreement had not specified a payment schedule

(5) years lease and $24.50 per square foot for the remainder of the lease term. The rental rate is gross plus tenants use of its own electric.

M.R. Wachob will actively market the space and pay for cost of some local advertising, flyers, newspapers advertising, signage, etc.

### COMMISSIONS

NOTICE: THE AMOUNT OR RATE OF REAL ESTATE COMMISSIONS IS NOT FIXED BY LAW. THEY ARE SET BY EACH BROKER INDIVIDUALLY AND MAY BE NEGOTIABLE BETWEEN THE SELLER AND BROKER.

MBM Partnership will pay a brokerage commission to M.R. Wachob in the amount of 5 percent of the gross aggregate lease including renewal options on leases made directly by M.R. Wachob. M.R. Wachob will invite the cooperation of other licensed brokers and in the event a co-operating broker successfully consummates a lease M.R. Wachob will receive 2 1/2 percent override and the co-operating broker will receive 5 percent commission. Commissions will be considered due and payable upon lease signing and possession by the tenant.

The term of this exclusive agreement commences July 1, 1989, and terminates December 31, 1989, or if George A. O'Brien becomes disassociated with M.R. Wachob, which ever occurs sooner.

If within 180 days following the expiration of this agreement, the property or any portion thereof is leased or negotiations commence and thereafter continue leading to the execution of a lease with any party to whom M.R. Wachob or any co-operating broker has shown the property prior to such expiration, M.R. Wachob shall be entitled to receive the commission, provided M.R. Wachob shall have furnished Owner with a written list identifying any such parties, such list to be sent by certified mail or delivered in person to MBM Partnership no later than fifteen (15) days after the expiration of this agreement.

There is one exception to this agreement; should Stanley Katz, Research America, Inc., and Mnemonics, Inc., related companies of Mr. Katz, lease space in the Glyco space, there is no commission due to M.R. Wachob Company, Inc. This exception is valid for 60 days from the commencement date of this agreement.

MBM Partnership has accepted the obligations of the lease between Minoff Properties, Landlord, and Glyco, Inc., tenant, dated, May 25, 1984.

This agreement is subject to section 46a-64 (formerly sec. 53–55) of the general statutes as amended (public accommodation act)."

for the commission, this letter (first amendment) served to amend that original listing agreement.[6] A representative of the defendant signed this letter upon receipt.

One month later, on November 29, 1989, the subtenant located by the plaintiff entered into the sublease. The sublease was clearly denominated as such and indicated that Glyco was the lessor. The terms of the document provided, however, that the subtenant was to pay all rent to the defendant. The sublease also provided that the defendant would pay the subtenant $346,400 "for any and all alterations required by the Sublessee," and three partners of the defendant partnership signed the lease.[7] Upon the execution of the sublease, the defendant paid to the plaintiff the sum of $95,591.25 —one half of the amount of the commission owed, as required in the listing agreement and the first amendment thereto.

One year later, on November 8, 1990, the plaintiff, its sales agent and the defendant entered into an agreement modifying their obligations under the original listing agreement and the amendment dated October 20,

---

[6] The first amendment to the listing agreement provided:

"Bob Pietrzak
MBM Partnership
12 Route 17 North
Paramus, New Jersey 07652

Dear Bob:

This will confirm our understanding that if I lease the top floor of 488 Main Avenue, Norwalk, Connecticut, the following commission will be paid as follows:

7 1/2% Commission of the total rent for the entire length of the lease to be paid as follows:

   *1/2 of the commission to be paid upon the signing of the lease
   *1/4 of the commission to be paid December, 1991
   *1/4 of the commission to be paid June, 1992

This agreement is subject to section 46a-64 (formerly sec. 53–55) of the general statutes as amended (public accommodation act)."

[7] The sublease also was signed by the president of Glyco.

1989. Under this agreement (second amendment),[8] the defendant acknowledged that the plaintiff was entitled to a total commission of $191,182.50 and that the defendant had paid only $95,591.25. The defendant further acknowledged that one half of the remaining balance—$47,795.50—would be due to the plaintiff in December, 1991, and that the other half would be due in June, 1992. A representative of the defendant signed the second amendment.

---

[8] The second amendment to the listing agreement provided in relevant part:

"AGREEMENT

AGREEMENT made as of Nov. 8, 1990, by and between M.R. WACHOB COMPANY, a Connecticut Corporation having a principal place of business at High Ridge Park, Stamford, Connecticut, acting herein by MICHAEL R. WACHOB, its President, hereunto duly authorized ('Wachob'), GEORGE O'BRIEN of 384 Hollow Tree Ridge Road, Darien, Connecticut ('O'Brien'), and MBM PARTNERSHIP, a Partnership organized and existing under the laws of the State of New Jersey, and having a principal place of business at 12 Route 17 North, Paramus, New Jersey, acting herein by MALVERN C. BURROUGHS, its partner, hereunto duly authorized ('MBM').

WITNESSETH:

WHEREAS, MBM and Wachob entered into an Exclusive Listing Agreement dated June 28, 1989, to lease certain space in a building located at 488 Main Avenue, Norwalk, Connecticut, a copy of which is attached hereto;

WHEREAS, pursuant to the aforementioned Agreement, Wachob leased the space and is entitled to a total commission of $191,182.50;

WHEREAS, $95,591.25 has been paid by MBM to Wachob on account of the total commission due;

WHEREAS, an additional payment on account of said total commission is due from MBM to Wachob in the amount of $47,795.50 in December, 1991, and an additional payment of $47,795.50 is due in June, 1992.

WHEREAS, Wachob and O'Brien acknowledge that O'Brien, as the Procuring Broker for Wachob, is due a commission from Wachob of $95,591.25;

WHEREAS, Wachob and O'Brien desire to have the remaining commission payments due from MBM to Wachob assigned to O'Brien to satisfy Wachob's obligations to O'Brien; and

WHEREAS, MBM is willing to make said additional commission payments directly to O'Brien if instructed to do so by Wachob.

NOW, THEREFORE, in consideration of the premises and of the mutual

The defendant failed to pay the plaintiff as scheduled in the second amendment, and the plaintiff brought this action against the defendant alleging breach of contract.[9] In its answer, the defendant alleged as a special defense that neither the original listing agreement nor either of the amendments thereto satisfied the requirements of § 20-325a (b), and thus claimed that the agreement was not enforceable.[10] The defendant also filed a two count counterclaim in which it alleged that the plaintiff had either fraudulently or negligently misrepresented the financial stability of the subtenant it had procured for the Norwalk office building. Both parties moved for summary judgment.

The trial court rendered summary judgment in favor of the defendant. In its memorandum of decision, the

covenants and agreements contained herein, the parties hereto agree as follows:

1. Wachob hereby irrevocably assigns to O'Brien all of its right, title and interest in and to the following commission payments due to Wachob from MBM pursuant to the attached Exclusive Listing Agreement:

(a) $47,795.50 in December, 1991; and

(b) $47,795.50 in June, 1992.

2. MBM hereby agrees to make the foregoing commission payments directly to O'Brien at his address set forth above, or at such other address as he may direct in writing.

3. O'Brien hereby accepts the assignment of commission payments set forth in paragraph 1 hereof as payment in full for all commissions due him from Wachob on account of leases procured by him pursuant to the attached Exclusive Listing Agreement, subject to collection of said commissions."

[9] The plaintiff alleged in a second count of the complaint that the defendant was equitably estopped from denying the terms of the contract. The trial court, however, granted summary judgment for the defendant on this count, and the plaintiff has not contested that judgment. The second count of the complaint, therefore, is not before this court on appeal.

[10] The defendant also alleged as special defenses that the plaintiff had failed to state a claim upon which relief could be granted, had performed its brokerage services in a negligent manner and had breached its fiduciary duty and its duty of good faith and fair dealing. The defendant further alleged as a special defense that it had paid some or all of the sums claimed to be due.

court noted that § 20-325a (b) sets forth certain mandatory requirements for a listing agreement, and concluded that the plaintiff had failed to satisfy that part of the statute requiring a listing agreement to "be signed by the owner or an agent authorized to act on behalf of the owner . . . ." The trial court relied on the decision of this court in *McCutcheon & Burr, Inc.* v. *Berman,* 218 Conn. 512, 590 A.2d 438 (1991), for the proposition that "owner," as used in the statute, meant the record owner of the property "as displayed on the land records." Id., 522. Finding that Minoff Properties was the record owner of the Norwalk office building, and further finding that Minoff Properties had signed neither the original listing agreement between the parties nor either of the two subsequent amendments, the trial court concluded that the plaintiff could not recover the commission from the defendant. The trial court, therefore, granted the defendant's motion for summary judgment.[11]

On appeal, the plaintiff makes a two part argument. First, it contends that the word "owner," as it is used in § 20-325a (b), should be construed to mean the owner of the property interest which is the subject of the real estate contract at issue. Because the subject of the listing agreement in this case was a tenancy for years, the plaintiff argues, the owner of that leasehold, rather than the owner of the fee simple, was the "owner" for purposes of the statute. Second, the plaintiff argues that because the defendant had undertaken all of Glyco's obligations under the original lease between Minoff Properties and Glyco, the defendant was, in effect, the owner of the leasehold for purposes of § 20-325a (b).[12] We agree with the plaintiff.

[11] The trial court did not reach the merits of the defendant's remaining special defenses or counterclaim.

[12] As an alternative ground for affirmance, the defendant argues that the listing agreement is unenforceable because it does not comply with Gen-

I

"The right of a brokerage firm to recover a commission depends upon the terms of its employment contract with the seller. To be enforceable, this employment contract, often called a listing contract, must be in writing and must contain the information enumerated in General Statutes § 20-325a (b)." *Revere Real Estate, Inc.* v. *Cerato*, 186 Conn. 74, 77, 438 A.2d 1202 (1982). General Statutes (Rev. to 1989) § 20-325a (b) provides that such an agreement must "(1) be in writing, (2) contain the names and addresses of all the parties thereto, (3) show the date on which such contract was entered into . . . (4) contain the conditions of such contract . . . and (5) *be signed by the owner or an agent authorized to act on behalf of the owner* . . . and by the real estate broker or his authorized agent." (Emphasis added.) Whether a listing agreement complies with these requirements is a question of law. *New England Land Co., Ltd.* v. *DeMarkey*, 213 Conn. 612, 623, 569 A.2d 1098 (1990).

We have had occasion only once to consider the meaning of the term "owner" as it appears in § 20-325a. In *McCutcheon & Burr, Inc.* v. *Berman*, supra, 218 Conn. 512, we interpreted the enforceability of a listing agree-

---

eral Statutes § 47-5. That statute, which is cited in § 20-325a (b) (5), requires all documents purporting to convey real property to be acknowledged and witnessed.

The defendant's argument is without merit. Section 20-325a (b) (5) refers to instances in which an agent may sign a listing agreement on behalf of the owner of the property. In such a case, § 20-325a (b) (5) requires the document evidencing the *agency relationship* to be in writing and to comply with the conveyance formalities enumerated in § 47-5. In effect, therefore, this statutory provision limits how an agent of an owner must derive his power as an agent. It is undisputed that Glyco and the defendant did not enter into such an agency agreement and, therefore, the signature of the defendant on the listing agreement is not enforceable against the defendant or Glyco on this basis. Thus, this provision is simply irrelevant to this case.

ment for the sale of an office park in Cromwell. In that case, three individuals—William W. Berman, Edward Silverman and Loreto G. Marocchini—held title to the office park property as tenants in common. Id., 515 n.2. The public land records also identified these individuals as the owners of the property. The listing agreement at issue in that case, however, referred to the owner of the property not as these three individuals, but as a group identified as "Washington Ridge Associates, Ptnshp." Id., 515. Underneath the partnership's name on the listing agreement appeared the signature of "William Berman, Partner." Id.

After procuring a buyer for the office park, the real estate agency sought to collect its commission in accordance with the listing agreement. The owners of the property, however, contended that the listing agreement was unenforceable because it did not include the names of the three individuals who held record title to the property as tenants in common. Id., 519. The real estate agency countered that Berman, acting as a partner, had authority under principles of partnership law to act on behalf of the partnership. Id., 519–20.

This court concluded that the listing agreement failed to satisfy the element of § 20-325a (b) that required the owner of the property interest at issue to sign the listing agreement. This court reasoned "that 'owner,' as used in § 20-325a (b), means the record owner or owners as displayed on the land records." Id., 522. Because only one of the three individuals identified in the land records as owners had signed the listing agreement, this court found the agreement to be unenforceable.

The holding of this court in *McCutcheon & Burr, Inc.*, however, does not predetermine the result we must reach in this case. In *McCutcheon & Burr, Inc.*, the property interest at issue was the entire fee simple of the office park. Here, however, the property interest

in issue is a tenancy for years. We must determine, therefore, whether the term "owner," as it is used in § 20-325a, may possess different connotations depending upon the estate that is the subject matter of the listing agreement and the context in which the word is used.

As we have noted in other settings, the meaning of the term "owner" can rarely be ascertained in a vacuum, devoid of all statutory or legislative context. "The word 'owner' has no fixed meaning but must be interpreted in its context and according to the circumstances in which it is used. . . . Courts have not agreed in the application of the meaning of the word, even when due allowance is made for the differing phraseology of the statutes involved and the circumstances under consideration." (Citations omitted.) *Warren* v. *Borawski*, 130 Conn. 676, 679–80, 37 A.2d 364 (1944) (interpreting zoning ordinance). "The term 'owner' is one of general application and includes one having an interest other than the full legal and beneficial title. . . . The word owner is one of flexible meaning, and it varies from an absolute proprietary interest to a mere possessory right. . . . The term is broad enough to cover a tenant for years, a tenant for life, and a remainderman." *Hope* v. *Cavallo*, 163 Conn. 576, 580–81, 316 A.2d 407 (1972) (motor vehicle statute).

In order to determine the meaning of the term "owner" as it appears in § 20-325a (b), therefore, we must consider the history and purpose of the statute, as well as any legislative history that may illuminate the intent of the legislature in choosing that particular word.

The legislature enacted the original version of § 20-325a during the 1971 legislative session. The statute originated as one of ten bills proposed by the Connecticut real estate commission "to strengthen the real

estate industry by strengthening the real estate licensing law and in so doing safeguard the public's interest." Conn. Joint Standing Committee Hearings, Insurance and Real Estate, 1971 Sess., p. 225, remarks of James Carey, executive director of the Connecticut real estate commission. Senator George J. Crafts explained that prior to the enactment of the statute the courts of this state were "quite often filled with cases concerning disputes over real estate commissions and conditions under which the brokers were engaged to perform. This law spells it out and really clarifies a great number of problems." 14 S. Proc., Pt. 5, 1971 Sess., pp. 2315–16.

Section 20-325a (b) was targeted primarily at the sales of single-family homes, and was designed to ensure that a homeowner who hired a broker to sell his or her home would understand the terms and conditions under which the owner would be obligated to pay the broker a commission. David Kotkin, an attorney representing the Connecticut association of real estate boards, testified that the provision "is really oriented to the single family house owner who might be confused by the listing of property and therefore the Commission has suggested that the listing of properties be done in a certain way on forms approved by the Commission." Conn. Joint Standing Committee Hearings, Insurance and Real Estate, 1971 Sess., p. 230. Indeed, the bill was aimed primarily at private residential transactions because "the kind of sophisticated people who are dealing with commercial and in commercial properties would not need that kind of protection. . . . The homeowner needs all the protection because it is a massive transaction for the homeowner. And the Real Estate Commission wants to give the homeowner as much protection as possible so they've spelled out a list of four or five different things that have to be in the listing contract." Id., pp. 230–31.

The original version of the statute did not require that the "owner" of the property sign the listing agreement. Rather, the version of the statute that was enacted in 1971 required that the agreement "be signed by the parties thereto." General Statutes (Rev. to 1975) § 20-325a (b).

In 1984, however, the legislature amended the statute, partly in response to the decision of this court in *Thornton Real Estate, Inc.* v. *Lobdell*, 184 Conn. 228, 439 A.2d 946 (1981). In *Thornton Real Estate, Inc.*, this court had held unenforceable a listing agreement signed by an agent of the owner, rather than by the owner himself. Reasoning that the statute required the signatures of "the parties thereto," this court had concluded that the real estate broker could not recover his commission because a "broker who does not follow the mandate of the statute does so at his peril." Id., 230–31.

As a result of this court's decision in *Thornton Real Estate, Inc.*, the legislature changed the language of the statute to require only that the listing agreement "be signed by the seller or his agent . . . and by the real estate broker or his authorized agent." General Statutes (Rev. to 1985) § 20-325a (b). The legislature made this change in order to "increase the number of persons who may legally sign a real estate listing agreement. . . . [T]he problem with our current law is that courts have interpreted it so literally, that any listing agreement that doesn't contain the personal signatures of all parties may be ruled invalid . . . ." 27 S. Proc., Pt. 4, 1984 Sess., pp. 1413-14, remarks of Senator Wayne A. Baker; see Conn. Joint Standing Committee Hearings, Insurance and Real Estate, 1984 Sess., pp. 63–64, remarks of Timothy Calnen, Connecticut association of realtors.

The following year, the legislature again amended the statute, this time replacing the word "seller" with

the word "owner." Larry Hannafin, the director of the real estate division of the department of consumer protection, testified that this change was needed to clarify the signature requirements in cases where the real estate transaction in issue is not a sale of property, but a lease. "A typical example and question we receive quite frequently at the commission is, I am going to lease my apartment. I'm going to be using a real estate licensee to lease that property and as a lessor, do I sign that or *who signs it because I am not the seller. I am a lessor.* So in a situation like that, by simply deleting the word seller, [and] inserting the word owner, I think it will eliminate some of the problems . . . ." (Emphasis added.) Conn. Joint Standing Committee Hearings, Insurance and Real Estate, 1985 Sess., p. 71, remarks of Larry Hannafin. Significantly, Hannafin was the only person to testify about the merits of the bill before the joint standing committee on insurance and real estate issued a favorable report on it.

On the basis of the foregoing legislative history, we conclude that the word "owner" as it is used in § 20-325a (b), refers to the owner of the property interest that is the subject of the listing agreement. We reach this conclusion for several reasons.

First, as Hannafin's testimony clearly demonstrates, the word "owner" was incorporated into the statute specifically to cover listing agreements pertaining to the lease of real property. Accordingly, we can infer that the legislature, in requiring the signature of the "owner," was focusing not on the ownership of the fee, but rather on the ownership of the property interest that was the subject of the listing agreement.

Second, the legislative history of the 1984 amendment reveals that the legislature has attempted to avoid narrow judicial constructions of the language of the statute. Indeed, the legislature altered the language

of the statute in direct response to this court's decision in *Thornton Real Estate, Inc.* v. *Lobdell,* supra, 184 Conn. 228, in which this court had held unenforceable a listing agreement that failed to satisfy the literal language of the statute. In so doing, the legislature clearly expressed its position that it did not intend the literal language of the statute necessarily to erect barriers to the recovery of otherwise valid real estate commissions.

Finally, the legislature has stated repeatedly that the statutory requirements for listing agreements are designed to simplify and clarify the process of hiring real estate brokers. Interpreting the statute to mean that whenever a lessee wishes to hire a broker to find a subtenant or assignee, the owner of the fee simple must sign the listing agreement, would unnecessarily complicate this process and hinder the very purpose of the statute. Indeed, such a requirement, in practical effect, would require a lessee in every case to procure the signature of the owner of the land and building before entering into such a listing agreement with a real estate broker. Thus, under the defendant's interpretation of the statute, a lessee who had failed to obtain the signature of the owner of the land and building could never enter into an enforceable listing agreement with a real estate brokerage.

The defendant argues, however, that interpreting the term "owner" in § 20-325a to mean the owner of the interest that is the subject of the agreement, rather than the owner of the land and building, is directly contrary to our decision in *McCutcheon & Burr, Inc.* v. *Berman,* supra, 218 Conn. 512. We disagree. Although in *McCutcheon & Burr, Inc.,* we stated "that 'owner,' as used in § 20-325a (b), means the record owner or owners as displayed on the land records"; id., 522; we intended to refer only to the owner of the property interest that was the subject of the listing agreement,

which in that case was the fee simple in an office park. We reasoned that the record owners of the property interest at issue, the fee simple, were identified in the public land records and, therefore, these identified owners were required to sign the agreement. We did not intend to suggest that the signature of the "owner" means the signature of the record owner of the fee simple even in cases in which the fee simple is not the subject of the listing agreement.

We conclude, therefore, that General Statutes (Rev. to 1989) § 20-325a (b) requires that a listing agreement contain the signature of the owner of the property interest that is the subject of the agreement.

## II

The defendant argues, however, that even if "owner" as that term is used in § 20-325a (b) refers to the owner of the property interest that is the subject of the listing agreement, the defendant does not satisfy this requirement. The defendant raises two principal arguments in support of its position. First, it argues that the document in which it agreed to assume Glyco's obligations under the lease was merely a "guaranty," and that this document only served to establish that the defendant was a "leasehold guarantor, [who] merely guaranteed the remainder of the rental payments from the tenant Glyco, to the owner, Minoff [Properties.]" Second, the defendant argues that it could not have become the owner of the leasehold because Minoff Properties "maintained control over the property even while leased to Glyco" and because Minoff Properties "retained the right of subtenant approval." Neither of these arguments is persuasive.

## A

The defendant's attempt to paint itself as merely a leasehold guarantor who guaranteed rental payments

ignores the undisputed facts of this case. The documents in evidence and the defendant's memoranda of law before the trial court clearly illustrate that the defendant, in entering into the agreement with Lonza, assumed a significantly greater role than that of a mere guarantor of the lease in the Norwalk office building.

First, the defendant recited in the "guaranty" agreement that Lonza would have "refused" to enter into a lease for the defendant's office building in New Jersey unless the defendant relieved Glyco of its obligations under the lease for the Norwalk office building. The defendant, in turn, expressly stated to Lonza that it had "agreed to assume the obligations of Lonza's wholly-owned subsidiary, Glyco, Inc., under the terms of a Lease dated May 24, 1984, between Glyco, Inc., as tenant, and Minoff Properties, as landlord . . . ." In a simultaneous transaction, Glyco entered into a lease with the defendant in its building in New Jersey. Moreover, the agreement between Lonza and the defendant expressly provided that the defendant would assume "the full and punctual performance and observance . . . of *all of the terms, covenants and conditions in the Glyco Lease* . . . ." (Emphasis added.) The lease between Glyco and Minoff Properties required that Glyco: maintain insurance on the leased space; maintain and repair nonstandard improvements at its own expense; pay all utilities, including lighting, heat, air conditioning and gas; and pay rent, service rent, a pro rata share of increases in service rent, and a pro rata share of increases in real estate taxes. Clearly, Lonza, Glyco and the defendant all intended that the defendant would not only succeed Glyco as the lessee in the Norwalk office building, but that the defendant would step into the shoes of Glyco.

Second, the defendant took control and dominion over the tenancy in the Norwalk office building, holding itself out as the new lessee. In entering into the

listing agreement with the plaintiff, for example, the defendant stated that it "has accepted the obligations of the lease between Minoff Properties, landlord, and Glyco, Inc., tenant, dated, May 25, 1984."

Third, the sublease of the Norwalk office building revealed that the defendant, rather than Glyco, was the real party in interest and the assignee of the lease. The subtenant paid all rent to the defendant, and the defendant paid to the subtenant $346,400 for alterations of the office space. Moreover, upon the execution of the sublease, the defendant paid to the plaintiff $95,591.25—one half of the amount of the plaintiff's commission. Indeed, the defendant acknowledged in the second amendment to the listing agreement that it still owed the plaintiff the balance of the commission.

Finally, the defendant conceded in its trial court briefs that it had become the tenant of the Norwalk office building. In its memorandum of law in support of its motion for summary judgment before the trial court, the defendant argued that the listing agreement was not enforceable because it had not been signed by the owner of the land and the Norwalk office building, Minoff Properties. The signature of the defendant alone was insufficient, it argued, because it was "merely [a] former tenant of the property." This statement makes clear that even the defendant viewed itself as the tenant of the Norwalk office building and the real party in interest under the listing agreement.

B

Moreover, the defendant cannot evade its obligations by using as a shield the right of Minoff Properties to approve assignees and subtenants. Even if Glyco's assignment of the lease was in breach of a restriction on alienation in its lease with Minoff Properties, that restriction is not enforceable by the defendant. "It is generally said that a restriction against assign-

ment or subletting is for the landlord's benefit . . . ." 1 M. Friedman, Leases (1990) § 7.304d, p. 324. Such a covenant, therefore, can be enforced only by the landlord or his assignee. "The assignee of a lessee to whom the lease has been assigned in violation of the covenant cannot avail himself of that breach of covenant . . . ." 49 Am. Jur. 2d 422, Landlord and Tenant § 408 (1970); *Morrison* v. *Nelson*, 38 Wash. 2d 649, 659, 231 P.2d 335 (1951). The defendant, in other words, cannot use this provision as a means to escape liability to the plaintiff under the listing agreement.

We conclude that the term "owner" in General Statutes (Rev. to 1989) § 20-325a (b) refers to the owner of the property interest that is the subject of the listing agreement and that the defendant in this case was the owner of the leasehold interest in the Norwalk office building for purposes of that statute. Accordingly, the trial court should not have rendered summary judgment for the defendant on this ground.

The judgment is reversed, and the case is remanded to the trial court for further proceedings consistent with this opinion, including consideration of the defendant's remaining special defenses and counterclaim.

In this opinion the other justices concurred.